**IN THE**
**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF MARYLAND**
**(Southern Division)**

| | |
|---|---|
| HERNAN PALMA, LILIAN PALMA, and D. PALMA, *through her next friend* HERNAN PALMA,<br><br>*Plaintiffs*,<br><br>v.<br><br>MONTGOMERY COUNTY, MARYLAND<br>Serve: County Executive Marc Elrich<br>Executive Office Building<br>101 Monroe Street, 2nd Floor<br>Rockville, Maryland 20850,<br><br>MONTGOMERY COUNTY POLICE DEPARTMENT<br>100 Edison Park Drive, 3rd Floor<br>Gaithersburg, MD 20878,<br><br>CHIEF MARCUS JONES<br>(in his official and individual capacity)<br>100 Edison Park Drive, 3rd Floor<br>Gaithersburg, MD 20878,<br><br>CPL. ROBERT FARMER<br>(in his official and individual capacity)<br>4823 Ruby Ave.<br>Bethesda, MD 20814,<br><br>SGT. RICHARD ARMAGOST<br>(in his official and individual capacity)<br>100 Edison Park Drive, 3rd Floor<br>Gaithersburg, MD 20878,<br><br>OFFICER DAVID KOCEVAR<br>(in his official and individual capacity)<br>4823 Ruby Ave.<br>Bethesda, MD 20814,<br><br>DET. TOMASZ MACHON<br>(in his official and individual capacity) | No. 21-1090<br><br>**JURY TRIAL REQUESTED** |

100 Edison Park Drive, 3rd Floor
Gaithersburg, MD 20878,

DET. GREGORY MARTINEZ
(in his official and individual capacity)
100 Edison Park Drive, 3rd Floor
Gaithersburg, MD 20878,

OFFICER PATRICK ROBINSON
(in his official and individual capacity)
100 Edison Park Drive, 3rd Floor
Gaithersburg, MD 20878,

DEPUTY JOHN-LUKE ESPINAS
(in his official and individual capacity)
100 Edison Park Drive, 3rd Floor
Gaithersburg, MD 20878,

OFFICER SEAN PETTY
(in his official and individual capacity)
4823 Ruby Ave.
Bethesda, MD 20814,

OFFICER GLENN ALTSHULER
(in his official and individual capacity)
4823 Ruby Ave.
Bethesda, MD 20814,

UNKNOWN OFFICERS 1-28
(in their official and individual capacities)

*Defendants*.

## COMPLAINT

1. Plaintiffs Hernan Palma, Lilian Palma, and D. Palma, through her next friend Hernan Palma (collectively, the "Palmas"), bring this Complaint against Montgomery County, Maryland, the Montgomery County Police Department ("MCPD"), and individual Montgomery County officers for subjecting the Palmas to an illegal and unreasonable seizure, using excessive force against the Palmas, and creating an unjustified risk of serious injury by executing an

unlawful and unjustified no-knock search warrant at the Palmas' home to apprehend the son of the Palmas' downstairs tenant, who had no access to the Palmas' living space.

2. Montgomery County police terrorized an innocent family. The Palmas are exemplary community members: Hernan is a Montgomery County firefighter, and the Palmas' daughter is an excellent student at a Montgomery County public school. Additionally, Lilian has battled serious kidney disease for years. Hernan administers Lilian's regular dialysis treatments, and at one point donated a kidney to her. The Palmas were not, and never had been, suspected of any wrongdoing. Instead, they were the victims of an over-zealous police force that was willing to make misleading omissions to the court and jeopardize innocent life—one officer chided Hernan that he was lucky the officer had not shot him—in order to capture a suspect they had been investigating for months, and whom they had passed up repeated opportunities to arrest away from the Palmas' house.

3. Making matters worse, the full extent of Defendants' misconduct may not be known, because they violated MCPD policies by failing to record the full interaction on their body cameras. Instead, they recorded only a short snippet of the events, and abruptly cut off the recording without citing any authorization to do so.

4. The events that culminated in the raid of the Palmas' home began in mid-2019, when the police opened an extensive investigation into David Zelaya, whose mother was renting a basement apartment from the Palmas. Zelaya was suspected of felony drug and firearm possession.

5. During their investigation, MCPD developed reason to believe that the Palmas lived upstairs with their thirteen-year-old daughter, in a separate part of their house which Zelaya could not access. They repeatedly observed Zelaya coming and going from a basement door,

and on at least one occasion they observed the Palmas entering through the front door. Yet MCPD sought a no-knock search warrant to search the Palmas' entire home. In doing so, the police failed to disclose to the court that the Palmas lived in the house to be searched, and that there was no probable cause to search the Palmas' portion of the house.

6. These material omissions rendered the resulting warrant illegal under the Fourth Amendment.

7. The police executed this illegal warrant at or around 4:30 A.M., bursting into the Palmas' home in the dark and surprising Hernan, who had been asleep in a bedroom near the front door. At first, Hernan thought that robbers had broken into his home and were going to harm his family. He repeatedly asked the intruders who they were and what they were doing in his home, but they would not answer. One of the men pushed a long gun into Hernan's chest. Another punched him in the face. Then three or four tackled Hernan, stepped on him, and pinned him down with such force that his face cracked a wall. The officers continued to strike Hernan's body while demanding that he allow himself to be handcuffed—even though the weight of the officers' bodies on top of him made it impossible.

8. Defendants then forcefully handcuffed Hernan, as well as Lilian and their daughter and, for the next several hours, detained them while they ransacked their house.

9. Eventually, one officer acknowledged MCPD's awareness that the Palmas lived upstairs in a separate part of the house, telling Hernan, "You should be more careful who you rent your basement to."

10. These unlawful events have left the Palmas traumatized and feeling betrayed, ashamed, and afraid. They have suffered physical pain, nightmares, damage to their home, and substantial, continuing emotional distress.

## PARTIES

**A. Plaintiffs.**

11. Plaintiff Hernan Palma is a resident of Silver Spring, Maryland. Originally from Chile, he has been a legal resident since 1997 and became a naturalized U.S. Citizen in 2012.

12. Plaintiff Lilian Palma is a resident of Silver Spring, Maryland. Originally from Chile, she has been a legal resident since 1997 and became a naturalized U.S. Citizen in 2012.

13. Plaintiff D. Palma, the Palmas' minor daughter, is a resident of Silver Spring, Maryland. All claims of daughter D. Palma are brought on her behalf by Hernan Palma.

**B. Defendants.**

14. Defendant Montgomery County is a county in Maryland.

15. Defendant Montgomery County Police Department is an agency of Montgomery County.

16. Defendant Marcus Jones has been the chief of police for the Montgomery County Police Department since November 2019. He served as Acting Chief beginning in June 2019.

17. Defendant Robert Farmer (MCPD 2593) is a corporal in the Montgomery County Police Department. Defendant Farmer swore out the application in support of the warrant to search the Palmas' home, and participated in the search of the Palmas' home, where he operated a body-worn camera that recorded part of the events.

18. Defendant Richard Armagost (MCPD 1250) is a sergeant in the Montgomery County Police Department who served as a supervisor at the scene of the search of the Palmas' house and participated in the search.

19. Defendant David Kocevar (MCPD 2378) is a Montgomery County police officer who participated in the execution of the warrant to search the Palmas' home.

20. Defendant Tomasz Machon (MCPD 2448) is a Montgomery County police officer who participated in the execution of the warrant to search the Palmas' home.

21. Defendant Gregory Martinez (MCPD 1556) is a detective with the Montgomery County Police Department who participated in the execution of the warrant to search the Palmas' home.

22. Defendant Patrick Robinson (MCPD 1128) is a corporal in the Montgomery County Police Department who participated in the execution of the warrant to search the Palmas' home.

23. Defendant John-Luke Espinas (MCSO 6285) is a Montgomery County deputy sheriff who participated in the execution of the warrant to search the Palmas' home.

24. Defendant Sean Petty (MCPD 2627) is a Montgomery County police officer who participated in the execution of the warrant to search the Palmas' home.

25. Defendant Glenn Altshuler (MCPD 2785) is a Montgomery County police officer who participated in the execution of the warrant to search the Palmas' home.

26. The remaining Defendants, Unknown Officers 1 through 28, are the officers listed as "TACTICAL PERSONNEL" in the "Montgomery County Department of Police Tactical Section—Raid Report" issued following the raid of the Palmas' house. Because the report does not provide the officers' full names, the Palmas are presently unable to conclusively identify them. Upon information and belief, they are Officers Tupa, Browne, Tatakis, Phelps, Crandell, Mercurio, Young, Henry, Cochran, Stevens, Kamensky, McGaha, Morley, Hartman, Dove, Yamada, Groveman, Bennett, Ford, Mercer, Colon, Graves, Murray, McGregor, Rizzo, Battrey, Carroll, and Holland, all of whom, upon information and belief, participated in the raid on the Palmas' house. We will amend this Complaint as appropriate when we have learned these

officers' full names, either through discovery or, preferably, with the cooperation of Defendant MCPD after it is served.

27. Defendants Farmer, Armagost, Kocevar, Machon, Martinez, Robinson, Espinas, Petty, Altshuler, and Unknown Officers 1 through 28 are referred to collectively as the "Police Officer Defendants."

**JURISDICTION AND VENUE**

28. This Court has subject matter jurisdiction over this action under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 & 1367.

29. This Court has general jurisdiction over Defendant Montgomery County because it is a county located within the District of Maryland.

30. This Court has specific jurisdiction over all individual defendants because all relevant acts and omissions occurred within the District of Maryland.

31. Venue is proper in this Court because all of the events and omissions giving rise to this action occurred in the District of Maryland and Defendants are located in the District of Maryland.

32. On June 16, 2020, the Palmas served the Montgomery County Executive with a notice of claim pursuant to the Maryland Local Government Tort Claims Act ("LGTCA"), Md. Code Ann., Local Gov't § 5-304.

33. Hernan Palma has capacity to bring this action on behalf of his minor daughter D. Palma pursuant to Fed. R. Civ. P. 17(c)(1)(A) & (b)(3), and Md. Rules 2-202(b) and 1-202(m).

## FACTS

**A. The Palmas.**

34. The Palmas have lived, worked, and raised their daughter in Montgomery County since 2005. Hernan holds the rank of Firefighter III in the Montgomery County Fire and Rescue Service. In this role, Hernan is also an instructor at the Public Safety Training Academy, a shared training facility in which Hernan trains firefighters and sometimes trains alongside MCPD and its SWAT officers.

35. Lilian has suffered from chronic kidney disease for years. She has undergone three failed kidney transplants (including one kidney that Hernan donated). Because of her illness, she is unable to work and has to receive hemodialysis treatments five times a week. Each treatment lasts hours, and Hernan administers them through a catheter in Lilian's shoulder, using an in-home dialysis machine.

36. D. Palma is a Montgomery County Public Schools student.

37. Living only on a firefighter's salary, money is tight for the Palmas. In order to help make ends meet and defray some of Lilian's medical expenses, the Palmas decided to convert part of their basement into an apartment in 2014.

38. The basement apartment is self-contained and separate from the rest of the Palmas' house. It has its own entrance, kitchen, bedroom, bathroom, and living room. One section of the basement is accessible to the Palmas for their personal use, but the apartment does not have access to that section of the basement, or the upstairs, where the Palmas live.

39. In 2019, the Palmas began renting the apartment to a woman in her 50s. She had a son in his 20s named David Zelaya. She told the Palmas that Zelaya was a student at the University of Maryland, College Park, and that he had his own apartment. It was the Palmas'

understanding that they were only renting their basement to Zelaya's mother. Although they knew that Zelaya sometimes stayed with her, they did not keep track of when or how often.

40. Although the Palmas lived above their tenant, they did not interact with her other than for typical landlord responsibilities, and they were generally unaware of her activities, including when she had guests and who her guests were.

**B. Montgomery County Police Investigate Zelaya.**

41. Led by Defendant Farmer, the Montgomery County Police began investigating Zelaya for illegally possessing firearms, and for possession and distribution of controlled dangerous substances in May 2019. In the course of their investigation, MCPD developed evidence that Zelaya had possessed assault rifles, high-capacity magazines, handguns, armor-piercing rifle ammunition, cocaine, and marijuana.

42. The Palmas were never suspected of any wrongdoing and were never the subject of the police's investigation.

43. The investigation of Zelaya lasted months and included at least 30 days of covert surveillance. In July or August, MCPD orchestrated a controlled purchase of marijuana between Zelaya and a confidential informant, but they did not arrest him at the scene of that drug sale. In late August, MCPD placed a GPS tracker on Zelaya's car. On September 11, just two days before they searched the Palmas' house, police watched Zelaya climb into a van and spend five or ten minutes inside, but again, they did not take the opportunity to arrest him then.

44. Much of MCPD's surveillance occurred just outside the Palmas' home. In particular, the police observed the Palmas' home frequently enough to conclude that Zelaya "consistently" parked his car outside the home, and to observe Zelaya using a basement stairwell "on multiple occasions."

45. During their investigation, the police learned that the Palmas owned the house being surveilled. Despite having this information, they intentionally chose not to contact the Palmas.

46. Upon information and belief, Defendants' investigation revealed that the Palmas not only owned the house but lived in it with their minor daughter. On at least one occasion, the police actually photographed Hernan and D. Palma entering their front door.

47. Upon information and belief, Defendants never saw Zelaya use the main entrance to the Palmas' residence, and therefore knew that Zelaya did not use the main entrance or have access to the portion of the house where the Palmas lived.

48. Despite directly observing Zelaya distributing drugs under controlled conditions, being able to track his movement, and watching him closely over "30 days through covert surveillance," MCPD did not arrest Zelaya. Instead, they opted to arrest him at night inside the Palmas' basement. Upon information and belief, any reasonable officer with Defendants' knowledge would have had reason to know that the Palmas would be asleep upstairs when the raid took place.

**C. Defendants Obtain a Warrant.**

49. On September 12, 2019, police sought a warrant from the Circuit Court for Montgomery County to search the Palmas' house. Defendant Farmer filed, and swore to the accuracy of, the warrant application.

50. Defendant Farmer described the place to be searched as a "single family" residence and did not indicate that the Palmas also lived there.

51. Defendant Farmer stated:

> [] Your Affiant has been conducting ongoing surveillance on Zelaya for the past 30 days through covert surveillance as well as the GPS tracking device.

> As a result of the surveillance, Your Affiant has observed both of his registered vehicles consistently parked in front of the residence in the overnight hours. Based off this information Your Affiant believes Zelaya is living at the residence.
>
> [] In September 2019, Your Affiant conducted surveillance at the residence and observed Zelaya arrive in his Toyota Prius and park in front of the residence. You [*sic*] Affiant observed Zelaya walk through the side gate behind the driveway and into a basement stairwell on multiple occasions. Your Affiant has also observed Zelaya coming out of that stairwell on multiple occasions as well. Based off the investigation, Your Affiant knows this stairwell only leads to a single basement door.
>
> [] Your Affiant queried the Maryland Department of Assessments & Taxation for the residence. The residence is owned by Hernan Palma and Lilian Espinoza-Palms [*sic*]. Your Affiant has not contacted the owners of the residence for fear of compromising the investigation.

52. This carefully chosen information provided a limited and misleadingly incomplete glimpse into the facts developed during Defendants' extensive investigation. As noted by Defendant Farmer in the warrant application:

> Because this Affidavit is being submitted for a limited purpose, your Affiant has included only the information necessary to establish probable cause for the issuance of search warrants and has not included every detail known regarding this investigation.

53. Citing their "belief that firearm(s) are located in the residence," Zelaya's "history of assault, robbery, and burglary," and their fear that "announcing police presence would place those officers in serious danger," Defendants requested "an exception to the knock and announce rule[.]"

54. Defendants omitted key information from their warrant application, including the fact that the Palmas lived upstairs, that there was no reason to suspect that Zelaya would be found in the Palmas' portion of the house, and that police had no probable cause to believe any evidence of a crime would be found in the Palmas' upstairs residence.

55. The court issued the warrant as requested, allowing the police to enter without first knocking and announcing their presence.

**D. The Police Officer Defendants Raid the Palmas' Home.**

56. The Police Officer Defendants executed the warrant at or around 4:30 A.M. on September 13, 2019.

57. Officers arrested Zelaya after finding him in the basement.

58. The Palmas were all asleep when the police raid began. They were awoken by what sounded like an explosion as the Police Officer Defendants knocked down the front door.

59. Hernan ran straight for his daughter's bedroom, which was located near the front door, to make sure that she was safe. Although it was dark, Hernan could see masked men with guns pouring into his living room and the hallway leading to his daughter's bedroom. Hernan does not recall the men announcing themselves as police. He assumed they were robbers and feared they would harm his family.

60. As Hernan hurriedly turned the corner of the hallway, he felt a long-barreled rifle push into his chest. Afraid of being killed, Hernan grabbed the barrel of the rifle and pushed it away from him. He was then immediately tackled by three or four of the Police Officer Defendants.

61. Hernan asked the men who they were, but the officers refused to answer.

62. Several Police Officer Defendants pushed Hernan onto a bed near his daughter's room. He landed flat on his back and tried to sit up, but one of the officers punched Hernan in the face, knocking him back onto the bed.

63. The same three or four officers proceeded to flip Hernan face-down on the bed. Hernan's arms were pinned underneath his body, and his legs were bent and pinned against his

buttocks by the officers. Although Hernan's body was face-down, his neck was bent backward, and his face was pressed into the wall. The officers worked together to hold Hernan down with their body weight and applied so much pressure that Hernan's face made a crack in the wall.

64. Continuing to hold Hernan down, the same three or four Police Officer Defendants began striking his body and demanding that he hold out his arms. Hernan tried, but could not comply because his arms were trapped underneath his body, pinned down under the weight of the officers. Eventually, the officers pulled so hard that Hernan's arms were freed. They then handcuffed Hernan and sat him against the wall.

65. The officer who hit Hernan in the face stayed with him in the bedroom.

66. The officer who pushed the rifle barrel into Hernan's chest later remarked, while Hernan was still handcuffed, "you're lucky I didn't pop you."

67. Hernan continued to ask the officers why they were searching his house and restraining his family. He also asked to see a warrant, but the officers remained unresponsive. Eventually, one officer told Hernan, "You should be more careful who you rent your basement to."

68. Meanwhile, some Police Officer Defendants also handcuffed Lilian and D. Palma, and detained each of them in separate rooms.

69. At the time, Lilian was asleep in the Palmas' bedroom. Some Police Officer Defendants restrained Lilian, applying so much pressure to her shoulder that she feared her catheter would be ripped out.

70. D. Palma was awoken by officers brandishing guns who made her lie on the ground and handcuffed her.

71. At all times relevant to this Complaint, Defendants acted under color of state law.

**E. The Aftermath of the Search.**

72. After arresting Zelaya, the Police Officer Defendants continued searching the Palmas' house for several hours.

73. After over an hour and a half of being detained separately, Hernan and Lilian were brought into their family room, still in handcuffs. Officers then brought D. Palma into the family room, leading her by one arm as her hands were still handcuffed behind her back.

74. After a delay, officers uncuffed the Palmas but continued to ransack their home while holding the Palmas in their family room. After another hour, the Police Officer Defendants left the Palmas' broken home.

75. Although Hernan was still in shock, and physically and emotionally battered, he went to work just a few hours later to attend a scheduled event for state and county dignitaries, including Montgomery County councilmembers and MCPD's Chief of Police, Defendant Marcus Jones. As the day wore on, Hernan's adrenaline began to wear off and he started to feel the reality of his injuries set in.

76. The Palmas have suffered emotional and physical distress as a result of the raid on their home. Hernan's face still hurts from where the officer hit him and from when his face broke the wall. The pain in his face is most noticeable when he yawns or laughs. Hernan still has pain in both of his shoulders from having his arms ripped out from under his body while three or four officers forcibly held him down. Hernan also has pain in his right knee and ankle from when his legs were pinned behind his back and officers stepped on him. Hernan was covered in scrapes, cuts, and bruises, which took weeks to heal. Though he went to work that day, Hernan had to take two to three weeks off from work to recover.

77. The Palmas suffer from mood swings and have trouble sleeping since the raid. They are constantly afraid of the police, and D. Palma is apprehensive about going out at night and scared to call the police if she is in trouble. The Palmas have installed cameras in and around their home in an attempt to make them feel safer—from the police. Hernan began seeing a therapist but stopped once the COVID-19 pandemic began.

78. During their search, Defendants knocked down several doors in the Palmas' home, broke numerous windows, and damaged walls. One door was burst open with so much force that it blew off the hinges and hit Lilian's hemodialysis machine. Thankfully, the machine did not break, and Lilian is still able to receive her necessary treatments. Defendants also broke the Palmas' outdoor shed and severely damaged the basement apartment. All told, MCPD caused what they themselves described as an "extreme amount of damage" to the Palmas' home, but which their police report inaccurately attributed to Zelaya's criminal activities instead of their own actions.

79. The police report following execution of the warrant lists the Palmas' status as "victims."

**F. By Violating Departmental Policies, the Police Obscured the Extent of their Conduct.**

80. The MCPD's body-worn camera policies in effect at the time the Palmas' home was searched provided that body cameras must be activated "***[a]t the initiation of a call for service or other activity that is investigative or enforcement in nature***" and for "[a]ll searches (persons, vehicles, structures, effects), except strip searches." (Italics and boldface in original.)

81. In addition, once a camera has been activated, "officers will continue to record until" "***[t]he officer is no longer engaged in a related investigative or enforcement activity[.]***"

(Italics and boldface in original.) Moreover, whenever a body camera is deactivated, "the officer must record a brief verbal explanation for the deactivation prior to turning off the recording."

82. The Police Officer Defendants violated these policies during their search of the Palmas' home. Specifically, the video filmed by Defendant Farmer is incomplete. It begins after officers had already entered the Palmas' home and detained the Palmas, and it ends abruptly after less than 10 minutes, without Defendant Farmer providing an explanation for why he is turning off the recording. Defendant Farmer wrote that only portions of the events were filmed because undercover detectives were present; however, MCPD's body-worn camera policies at the time did not contain any such exception.

**G. The County's Failure to Protect Against Unreasonable No-Knock Warrants.**

83. The police raid on the Palmas' home was the culmination of a pattern and practice of oversights and omissions by the County and MCPD that led to a complete failure of safeguards against unreasonable or unjustified searches pursuant to no-knock warrants.

84. The Supreme Court and Fourth Circuit have made clear that police officers must generally announce their presence before executing a warrant, and that no-knock warrants should be the rare exception. Nevertheless, out of 140 search warrants executed by Montgomery County SWAT teams in 2019, 108—*or more than 77%*—were no-knock warrants.

85. Yet, despite the prevalence of no-knock warrants, the County and MCPD did not have adequate policies or training to ensure that no-knock warrants were limited to the situations when they were necessary, or to ensure that applications for no-knock warrants contained all material facts necessary to determine whether probable cause existed and whether an exception to the knock-and-announce requirement was justified.

86. Indeed, Montgomery County did not enact any regulations on the procedures for obtaining or executing no-knock warrants until July 2020—nearly a year after the raid on the Palmas' home—when it passed legislation imposing certain minimum standards regarding no-knock warrants. In the bill's legislative history, the County admitted that "[a]side from making the SWAT Unit responsible for high-risk warrants, current MCPD policy does not appear to address procedures for no-knock warrants."

87. By September 2019, the County and MCPD knew or reasonably should have known that the absence of policies and training concerning the proper procedure for obtaining and executing no-knock warrants posed a substantial risk to the safety, property, and privacy rights of Montgomery County citizens. Its failure to enact policies and training to ensure compliance with the Fourth Amendment, and its pattern and practice of condoning the use of unnecessary no-knock warrants, demonstrated a manifest, deliberate indifference to the rights of Montgomery County citizens.

## COUNT I
### 42 U.S.C. § 1983—Claim for Improper Warrant in Violation of Plaintiffs' Fourth and Fourteenth Amendment Rights (Against Defendant Farmer)

88. The Palmas adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

89. Under the Fourth Amendment to the Constitution, as applied to the State of Maryland through the Fourteenth Amendment, the Palmas have a right not to have their house, persons, or property unlawfully searched, seized, or detained in an unreasonable manner, and not to be deprived of liberty or property without due process of the law.

90. Upon information and belief, and as evidenced by MCPD's investigation, Defendant Farmer knew that the Palmas lived upstairs in a separate residence with their teenage

daughter and intentionally omitted this information from the warrant application while describing the residence as a “single family” home.

91. Upon information and belief, as evidenced by MCPD’s investigation, Defendant Farmer knew that there was no probable cause to believe Zelaya or any evidence of a crime would be found in the Palmas’ portion of the house.

92. Upon information and belief, as evidenced by MCPD’s investigation, Defendant Farmer knew that there was a substantial risk that the Palmas would be harmed during a no-knock search of their home.

93. The warrant application that Defendant Farmer swore out did not disclose any information demonstrating that the upstairs and downstairs contained separate residences—including that the Palmas lived in their house and that the Palmas and Zelaya used separate entrances—or that there was no evidence Zelaya had ever been present in the portion of the house where the Palmas lived.

94. These facts were excluded by Defendant Farmer despite his prior knowledge that the Palmas owned their house, and the evidence, which the investigation must have uncovered, that Zelaya’s mother rented the basement apartment from the Palmas and that Zelaya and his mother did not access any other portion of the Palmas’ residence.

95. These omitted facts, if included in the warrant application, would have negated any probable cause to search the portions of the house which Zelaya did not occupy and could not access, and negated any need to excuse the knock-and-announce rule.

96. By omitting material information relevant to whether probable cause existed to search the upstairs portion of the Palmas’ house, Defendant Farmer misled the magistrate into issuing a warrant that was not based on a complete evaluation of the known salient facts.

97. The resulting warrant was not supported by probable cause and was illegal and overbroad.

98. Defendant Farmer violated the Palmas' clearly established rights and afforded the Palmas less procedure than was due by deliberately, or at a minimum with reckless disregard for the truth, making material misrepresentations or omissions in seeking a warrant that would otherwise be without probable cause.

99. The conduct of Defendant Farmer violated clearly established constitutional rights of which all MCPD officers know, or of which reasonable officers should have known, rendering him liable to the Palmas under 42 U.S.C. § 1983.

100. At all times relevant to this count, Defendant Farmer acted under color of state law.

## COUNT II
## 42 U.S.C. § 1983—Claim for Unlawful Seizure
## (Against All Police Officer Defendants, Jointly and Severally)

101. The Palmas adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

102. Under the Fourth Amendment to the Constitution, as incorporated against the County by the Fourteenth Amendment, the Palmas have the right to be free from illegal seizures.

103. Under the Fifth Amendment to the Constitution, as incorporated against the County by the Fourteenth Amendment, the Palmas have a right not to be deprived of their liberty without due process of law.

104. The Police Officer Defendants unlawfully detained the Palmas for more than two and a half hours pursuant to an invalid warrant.

105. All Police Officer Defendants acted in concert to ensure the Palmas remained detained while their house was searched, and their collective action caused the Palmas one indivisible injury.

106. At all times relevant to this count, Defendants acted under color of state law.

**COUNT III**
**42 U.S.C. § 1983—Claim of Official Policy, Custom, and Deliberate Indifference to Lack of Official Policy**
**(Against Defendants Jones, Montgomery County, and MCPD)**

107. The Palmas adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

108. The MCPD, by and through its policymakers, had in force and effect, at the time of the conduct complained of in this Complaint, a policy, practice, or custom of condoning unnecessary or unjustified no-knock warrants and searches.

109. This included a lack of any policies or regulations concerning no-knock warrants, including policies to prevent the omission from warrant applications of facts that negate probable cause or that would be necessary for a judicial determination of probable cause, thereby increasing the likelihood that homeowners would be subjected to excessive force, unlawfully detained, and their property unlawfully searched.

110. The MCPD's lack of safeguards regarding no-knock warrants manifested a deliberate indifference to the rights of Montgomery County citizens.

111. The MCPD, by and through its policymakers, failed to ensure through custom, policy, training, and/or practice that its officers would not omit information relevant to the probable cause determination when applying for warrants, including no-knock search warrants.

112. The MCPD, by and through its policymakers, had actual or constructive notice of these failures to ensure safeguards regarding unlawful search warrants and the execution of no-

knock warrants, such that it was foreseeable that officers would omit information critical to the probable cause determination to be made by a reviewing judge when applying for no-knock search warrants.

113. By the time of the conduct complained of herein, the instances of no-knock search warrants had become so prevalent that, in the proper exercise of their official responsibility, Defendants Jones, Montgomery County, and MCPD should have known of the need to train officers and put policies in place to prevent unlawful no-knock searches from taking place.

114. Defendants Jones, Montgomery County, and MCPD, by and through their policymakers, failed to enact safeguards to prevent the unlawful use of no-knock warrants, even though it was foreseeable that constitutional violations and harm of the magnitude that the Palmas experienced would be the likely result of such failures. By condoning no-knock warrants in the absence of a policy on how to apply for and execute a no-knock warrant, constitutional harm like that suffered by the Palmas was easily foreseeable.

115. Such failures amounted to gross negligence, deliberate indifference, or intentional misconduct which directly and proximately caused the suffering, damages, and injuries alleged previously herein.

116. At all times relevant to this count, Defendants acted under color of state law.

**COUNT IV**
**42 U.S.C. § 1983—Claim for State-Created Danger**
**(Against All Police Officer Defendants, Jointly and Severally)**

117. The Palmas adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

118. The Police Officer Defendants intentionally created a great risk of serious harm when they chose to and did execute a no-knock warrant in search of a suspect thought to be

armed and dangerous, in a portion of a home where they knew or should have known that no one but innocent civilians and at least one minor resided.

119. After an extensive investigation, Defendants knew or should have known that Zelaya did not live in the upstairs portion of the Palmas' home.

120. After an extensive investigation, Defendants knew or should have known that the Palmas lived in the upstairs portion of the house.

121. Defendants knew that executing a no-knock warrant at the Palmas' house created a substantial risk that innocent third parties would be killed or injured.

122. Defendants acted with a conscious disregard of and deliberate indifference to these risks.

123. The Palmas' physical and emotional injuries and the damage to their home were easily foreseeable, direct results of MCPD's actions.

124. The Palmas are distinct from the public at large because their home was uniquely targeted by MCPD's investigation, and they suffered individualized harm as a result of the Defendants' wrongful acts.

125. Defendants' actions made the Palmas more vulnerable to serious physical and emotional injury, and these actions did ultimately result in physical and emotional harm to the Palmas at the hands of Defendants.

126. Defendants acted in concert, knew of the dangers their conduct created, and actively assisted one another in their tortious acts. This collective action caused an indivisible injury to the Palmas.

127. At all times relevant to this count, Defendants acted under color of state law.

**COUNT V**

**42 U.S.C. § 1983—Claim for Excessive Force in Violation of Plaintiffs' Fourth and Fourteenth Amendment Rights (Against One or More Unknown Police Officer Defendants Directly and as Aiders and Abettors)**

128. The Palmas adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

129. The Police Officer Defendants did not identify themselves, and the Palmas presently do not know the identities of the specific officers who engaged in the following conduct. We will amend this count to name the specific officers involved when that information is uncovered in discovery.

130. Under the Fourth Amendment to the Constitution, as applied to the State of Maryland through the Fourteenth Amendment, the Palmas have the right to be free from unlawful searches, seizures, or detentions of their house, persons, or property, and not to be subjected to excessive force.

131. Some combination of the Police Officer Defendants violated Hernan Palma's clearly established Fourth Amendment right to be free from excessive force when:

a. one pushed a long gun into his chest and told Hernan that he was lucky MCPD "didn't pop" him;

b. another hit Hernan in the face;

c. three or four tackled Hernan, stepped on him, and pinned him down with such force that Hernan's face broke a wall;

d. officers continued to strike Hernan's body and pull his arms while demanding that Hernan allow himself to be handcuffed even though the officers' body weight and force prevented Hernan from complying; and

e. officers unreasonably detained him for over two and one-half hours.

132. Some combination of Police Officer Defendants violated Lilian Palma's right to be free of excessive force when she was unreasonably restrained with such force that she thought that the catheter in her shoulder would be ripped out and was unreasonably detained for over two and one-half hours.

133. Some combination of Police Officer Defendants violated D. Palma's right to be free of excessive force when they awoke her, brandished a gun, made her lie on the ground, handcuffed her, unreasonably detained her for over two and one-half hours, and led her through her home by one arm.

134. Upon information and belief, additional Police Officer Defendants who did not directly engage in this conduct were aware of it and provided Defendants with assistance, and are liable as aiders and abettors.

135. The force detailed here was beyond the force necessary to detain an innocent family that posed no threat to officer safety, was done intentionally, and was beyond the amount of force a reasonable officer would use under the circumstances.

136. Any interest Defendants had in detaining the Palmas in this manner was substantially outweighed by the intrusion and damage it caused to the Palmas and their home.

137. The conduct of Defendants violated clearly established constitutional rights of which all MCPD officers know, or of which reasonable officers should have known, rendering them liable to the Palmas under 42 U.S.C. § 1983.

138. At all times relevant to this count, Defendants acted under color of state law.

**COUNT VI**
**Maryland Constitution—Claim of Pattern and Practice via the Maryland Declaration of Rights and the LGTCA**
**(Against Defendants Jones, Montgomery County, and MCPD)**

139. The Palmas adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

140. The Maryland Constitution prohibits local governments from engaging in a pattern or practice of unconstitutional conduct by their employees. Under Maryland Declaration of Rights Articles 24 & 26, the Palmas have the right not to have their house, persons, or property unlawfully searched, seized, or detained, and not to be deprived of liberty or property due to an improper warrant, or without due process of the law.

141. The MCPD, by and through its policymakers, including Defendant Jones, had in force and effect, at the time of the conduct complained of in this Complaint, a policy, practice, or custom of condoning the use of unlawful search warrants by its officers, thereby failing to ensure that homeowners and innocent citizens would not be unlawfully subjected to illegal searches and seizures.

142. The MCPD, by and through its policymakers, including Defendant Jones, failed to ensure through custom, policy, or practice that its officers would not omit information critical to the finding of probable cause, or for excusing the knock-and-announce requirement, when submitting warrants for judicial approval.

143. The MCPD, by and through its policymakers, including Defendant Jones, had actual or constructive notice of such failures regarding the inclusion in warrant applications of all information material to the probable cause determination.

144. It was foreseeable that constitutional violations and harm of the type the Palmas suffered would be the likely result of such failures.

145. Such failures, unconstitutional municipal customs, practices, and/or policies violated the Palmas' rights under the Maryland Constitution, and amounted to gross negligence, deliberate indifference, or intentional misconduct that directly and proximately caused the suffering, damages, and injuries previously alleged herein.

**COUNT VII**
**Md. Declaration of Rights Articles 24 & 26—Claim for Improper Warrant via the Md. Declaration of Rights and the LGTCA**
**(Against Defendants Farmer, Jones, MCPD, and Montgomery County)**

146. The Palmas adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

147. Under Maryland Declaration of Rights Articles 24 & 26, the Palmas have the right not to have their house, persons, or property unlawfully searched, seized, or detained, and not to be deprived of liberty or property due to an improper warrant, or without due process of the law.

148. Defendant Farmer's warrant application did not disclose any information demonstrating that the upstairs and downstairs contained separate residences—including that the Palmas lived in their house and that the Palmas and Zelaya used separate entrances—or that there was no probable cause to search the portions of the home where the Palmas lived.

149. These facts were excluded by Defendant Farmer despite his prior knowledge that the Palmas owned their house, and the evidence, which the investigation must have uncovered, that Zelaya's mother rented the basement apartment from the Palmas and that Zelaya and his mother did not access any other portion of the Palmas' residence.

150. These omitted facts, if included in the warrant application, would have negated any probable cause to search the portions of the house that Zelaya had no access to and would

have been material to the magistrate's decision whether to issue the warrant and whether to excuse the knock-and-announce requirement.

151. By omitting material information relevant to whether probable cause existed to search the upstairs residence of the Palmas' home, Defendant Farmer misled the magistrate into issuing a warrant that was not based on a complete evaluation of the known salient facts.

152. Defendant Farmer violated the Palmas' clearly established rights and afforded the Palmas less procedure than was due by deliberately, or at a minimum with reckless disregard for the truth, making material misrepresentations or omissions in seeking a warrant that would otherwise be without probable cause.

153. The conduct of Defendant Farmer violated clearly established rights of which all MCPD officers know, or of which reasonable officers should have known, rendering them liable to the Palmas under Maryland Declaration of Rights Articles 24 & 26.

154. Additionally, the constitutional tort alleged in this count was committed within the scope of Defendant Farmer's employment by Montgomery County, in furtherance of MCPD's purpose, and his actions were, upon information and belief, approved, consented to, and ratified by superior officers of MCPD, including Defendant Jones, acting within the scope of their employment. Montgomery County, MCPD, and Defendant Jones are vicariously liable for all such actions taken by Defendant Farmer, which were undertaken deliberately.

## COUNT VIII
**Md. Declaration of Rights Articles 24 & 26—Claim for Excessive Force via the Md. Declaration of Rights and the LGTCA**
**(Against Defendants Jones, MCPD, Montgomery County, and One or More Unknown Police Officer Defendants Directly and as Aiders and Abettors)**

155. The Palmas adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

156. The Police Officer Defendants did not identify themselves, and the Palmas presently do not know the identities of the specific officers who engaged in the following conduct. We will amend this count to name the specific officers involved when that information is uncovered in discovery.

157. Under Maryland Declaration of Rights Articles 24 & 26, the Palmas have the right to be free of unlawful searches, seizures, or detentions of their persons or property, and not to be subjected to excessive force, under color of an illegal warrant.

158. Some combination of Police Officer Defendants violated Hernan Palma's clearly established rights under Maryland Declaration of Rights Articles 24 & 26 to be free from excessive force when, *inter alia*:

a. one pushed a long gun into his chest and told Hernan that he was lucky MCPD "didn't pop" him;
b. another hit Hernan in the face;
c. three or four tackled Hernan, stepped on him, and pinned him down with such force that Hernan's face broke through a wall;
d. these officers continued to strike Hernan's body and pull his arms while demanding that Hernan give up his hands to be cuffed even though the officers' body weight and force prevented Hernan from complying; and
e. officers unreasonably detained him for over two and one-half hours.

159. Some combination of Police Officer Defendants violated Lilian Palma's right to be free of excessive force when she was unreasonably detained with such force that she thought that the catheter in her shoulder would be ripped out and was unreasonably detained for over two and one-half hours.

160. Some combination of Police Officer Defendants violated D. Palma's right to be free of excessive force when they awoke her, brandished a gun, made her lie on the ground, handcuffed her, unreasonably detained her for over two and one-half hours, and led her through her home by one arm.

161. Upon information and belief, additional Police Officer Defendants who did not directly engage in this conduct were aware of it and provided Defendants with assistance, and are liable as aiders and abettors.

162. The force detailed here was exerted intentionally, was beyond what was necessary to detain an innocent family that posed no threat to officer safety, and was beyond the amount of force a reasonable officer would use under the circumstances.

163. Any interest the Police Officer Defendants had in detaining the Palmas in this manner was substantially outweighed by the intrusion and damage it caused to the Palmas and their home.

164. Defendants violated clearly established rights of which all MCPD officers know, or of which reasonable officers should have known, rendering them liable to the Palmas under Maryland Declaration of Rights Articles 24 & 26.

165. Additionally, the constitutional tort alleged in this count was committed within the scope of Defendants' employment by Montgomery County, and in furtherance of MCPD's purpose, and their actions were, upon information and belief, approved, consented to, and ratified by superior MCPD officers, including Defendant Jones, acting within the scope of their employment. Montgomery County, MCPD, and Defendant Jones are vicariously liable for all such actions taken by their police officers, which were undertaken deliberately.

**COUNT IX**
**Battery via the LGTCA**
**(Against One or More Unknown Police Officer Defendants**
**Directly and as Aiders and Abettors)**

166. The Palmas adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

167. The Police Officer Defendants did not identify themselves, and the Palmas presently do not know the identities of the specific officers who engaged in the following conduct. We will amend this count to name the specific officers involved when that information is uncovered in discovery.

168. An unknown combination of Police Officer Defendants committed harmful and offensive touchings against the Palmas.

169. One officer pushed a long gun into Hernan's chest and later told Hernan that he was lucky MCPD "didn't pop" him; another officer hit Hernan in the face; and three or four officers tackled Hernan, stepped on him, pinned him down with such force that Hernan's face broke a wall, and continued to strike Hernan's body and pull his arms while demanding that Hernan provide his arms to be cuffed even though the officers' body weight and force prevented Hernan from complying.

170. An officer broke down Lilian's bedroom door and proceeded to restrain her with such force that she thought the catheter in her shoulder was going to burst out of her skin.

171. Officers forced D. Palma to lie on the ground while brandishing a gun, handcuffed her, and led her through her home by one arm.

172. Hernan, Lilian, and D. Palma were forcibly handcuffed and detained in separate rooms for much of the extensive search.

173. None of the Palmas consented to the officers' harmful and offensive contact.

174. The officers' conduct constituted intentional, harmful, and offensive touching of Hernan, Lilian, and D. Palma.

175. As a direct and proximate result of the foregoing, Hernan, Lilian, and their daughter suffered physical and emotional injury.

176. Upon information and belief, additional Police Officer Defendants who did not directly engage in this conduct were aware of it and provided Defendants with assistance, and are liable as aiders and abettors.

**COUNT X**
**Md. Declaration of Rights Articles 24 & 26—Claim for Illegal Seizure via the Md. Declaration of Rights and the LGTCA**
**(Against All Defendants)**

177. The Palmas adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

178. Under Maryland Declaration of Rights Articles 24 and 26, the Palmas have a right to be free of unlawful police seizures under color of an illegal warrant.

179. The Police Officer Defendants unlawfully detained the Palmas for more than two and one-half hours pursuant to an invalid warrant.

180. All Police Officer Defendants acted in concert to ensure the Palmas remained detained while their house was searched, and their collective action caused the Palmas one indivisible injury.

181. Additionally, the constitutional tort alleged in this count was committed within the scope of Defendants' employment by Montgomery County, and in furtherance of MCPD's purpose, and their actions were, upon information and belief, approved, consented to, and ratified by superior MCPD officers, including Defendant Jones, acting within the scope of their

employment. Montgomery County, MCPD, and Defendant Jones are vicariously liable for all such actions taken by their police officers, which were undertaken deliberately.

**COUNT XI**
**False Imprisonment and False Arrest via the LGTCA**
**(Against One or More Unknown Police Officer Defendants**
**Directly and as Aiders and Abettors)**

182. The Palmas adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

183. The Police Officer Defendants did not identify themselves, and the Palmas presently do not know the identities of the specific officers who engaged in the following conduct. We will amend this count to name the specific officers involved when that information is uncovered in discovery.

184. The Palmas were not free to avoid the officers conducting a no-knock search of their home. They were each physically restrained.

185. The Palmas did not consent to their detainment, which constituted an intentional restriction of their freedom of movement.

186. The search of the upstairs residence was illegal, unnecessary, and done without probable cause or adequate legal justification.

187. The Police Officer Defendants acted in concert and their actions caused one indivisible injury.

188. Upon information and belief, additional Police Officer Defendants who did not directly engage in this conduct were aware of it and provided Defendants with assistance, and are liable as aiders and abettors.

**WHEREFORE** the Palmas request that the Court:

1. Award them actual damages, including nonmonetary damages, for pain and suffering and emotional distress in an amount to be proven at trial but not less than $500,000 per Plaintiff.

2. Award them punitive damages against Defendants Farmer, Jones, and the Police Officer Defendants in an amount to be proved at trial, but not less than $1 million.

3. Award them their costs and attorneys' fees, in an amount to be proven after trial.

**JURY TRIAL REQUESTED**

May 5, 2021

Respectfully submitted,

/s/ *John R. Grimm*

Joseph P. Caleb (Bar No. 15035)
Philip Andonian (Bar No. 21656)

CALEB ANDONIAN PLLC
1100 H Street NW
Suite 315
Washington, DC 20005
202-953-9850
202-217-4100 (fax)
joe@calebandonian.com
phil@calebandonian.com

John R. Grimm (Bar No. 19223)
Owen H. Smith (Bar No. 21005)
Thomas G. Connolly (application for admission *pro hac vice* forthcoming)

HARRIS, WILTSHIRE & GRANNIS, LLP
1919 M Street NW
Washington, DC 20036
202-730-1330
202-730-1301 (fax)
jgrimm@hwglaw.com
osmith@hwglaw.com
tconnolly@hwglaw.com

*Counsel for Plaintiffs*