## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| HERNAN PALMA, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 8:21-cv-01090-PX |
| MONTGOMERY COUNTY, | * | |
| MARYLAND, *et al.*, | | |
| | * | |
| Defendants. | | |

\*\*\*

## <u>MEMORANDUM OPINION</u>

In the early morning hours of September 13, 2019, the Montgomery County Police Department raided the home of Plaintiffs Hernan Palma, Lilian Palma, and D.P., their thirteen-year-old daughter, pursuant to a "no-knock" search warrant.  Despite having no connection to the investigation related to the warrant, the Palmas were bum rushed, physically restrained, and terrorized.  Their experience, they contend, was not unique but rather part of a persistent practice of the Montgomery County Police Department.  Plaintiffs, in turn, filed suit pursuant to 42 U.S.C. § 1983, against Montgomery County ("the County") and 30 police officers (the "individual officers")[1] who participated in the execution of the search warrant (collectively "Defendants"), alleging violations of their right to be free from unconstitutional searches and seizures.

Pending before the Court is the County's motion to dismiss or, in the alterative, bifurcate discovery and trial.  *See* ECF No. 56.  The issues are fully briefed, and no hearing is necessary.  *See* D. Md. Loc. R. 105.6.  For the following reasons, the Court DENIES the motion.

---

[1] The lawsuit also names Marcus Jones, Chief of Police, in his individual capacity.  The Palmas have since agreed to drop him from the suit.  *See* ECF No. 66 at 19–20.  Accordingly, Defendant Marcus Jones is DISMISSED from this action.

I.      **Background**[2]

Plaintiffs Hernan Palma, Lilian Palma, and their thirteen-year-old daughter, D.P.,[3] live in a neighborhood of single-family homes in Silver Spring, Maryland.  Mr. Palma serves as a firefighter for the Montgomery County Fire and Rescue Service.  ECF No. 65 ¶¶ 2 & 53.  Mrs. Palma suffers from chronic kidney disease which limits her ability to work outside the home.  *Id.* ¶¶ 2 & 54.

Sometime in 2014, the Palmas converted a portion of their basement into a separate apartment.  *See* ECF No. 65 ¶¶ 56 & 57.  The apartment features "its own entrance, kitchen, bedroom, bathroom, and living room."  *Id.* ¶ 57.  The apartment itself is entirely self-contained.  *Id.*  An exterior door allows the tenant to enter the apartment independently, and that same door does not permit entry into the rest of the home in which the Palmas live.  *Id.*

In 2019, the Palmas rented the basement apartment to a single woman in her 50s.  *See* ECF No. 65 ¶ 58.  Her son, David Zelaya ("Zelaya"), attended college nearby at the University of Maryland, College Park and had his own apartment, but he occasionally stayed with his mother.  *Id.*  Unbeknownst to the Palmas, Zelaya was under criminal investigation for illegal possession of firearms, ammunition, and narcotics.  *Id.* ¶ 60.

---

[2] When reviewing a motion to dismiss, the Court construes all well-pleaded factual averments as true and most favorably to the non-moving party.  *See Lucero v. Early*, 873 F.3d 466, 469 (4th Cir. 2017).

[3] Plaintiff D.P. sues Defendants through her father and next friend, Mr. Palma.  *See* ECF No. 65 ¶ 1; *see also T.W. by Enk v. Brophy*, 124 F.3d 893, 895 (7th Cir. 1997) ("To maintain a suit in a federal court, a child or mental incompetent must be represented by a competent adult.") (citing *Gardner by Gardner v. Parson*, 874 F.2d 131, 137 n.10 (3d Cir. 1989)).  Because D.P. is thirteen years old, she will be identified by initials only.  *See* Fed. R. Civ. P. 5.2(a)(3) (filings that include the names of minors "may include only" the minor's initials).

2

### A.  The MCPD Investigation and Warrant Application

Zelaya first came to the attention of MCPD in May of 2019.  *See* ECF No. 65 ¶ 60.

MCPD, using a confidential informant, bought marijuana from Zelaya, and in August, placed a

GPS tracker on one of Zelaya's cars.  *Id.* ¶ 62.  MCPD also visually surveilled Zelaya.  *Id.*

Officers observed Zelaya's cars parked in front of the Palma residence and his coming and going

through the basement apartment door.  *Id.* ¶¶ 63, 71.  MCPD never observed Zelaya enter the

main residence.  *Id.* ¶ 66.  MCPD's investigation also revealed that the Palmas owned and lived

in the main residence with their daughter.  *Id.* ¶ 65.  On at least one occasion, the police

photographed Mr. Palma and D.P. entering their front door.  *Id.*

On September 12, 2019, MCPD corporal Defendant Robert Farmer ("Officer Farmer"),

swore out an application for a warrant to search the Palma residence based on the Zelaya

investigation.  ECF No. 65 ¶¶ 60 & 69.  Officer Farmer, as the affiant, attested that he had "been

conducting ongoing surveillance" of Zelaya's movements, and that he believed Zelaya lived in

the home.  *Id.* ¶¶ 70 & 71.  Officer Farmer also attested that, according to public records, the

Palmas owned the home but that he had not contacted them for "fear of compromising the

investigation."  *Id.* ¶ 71.

Notably absent from the facts supporting the warrant application, however, were the

known details of the *occupants* of the home.  The application omitted that MCPD had

observed—and even photographed—Mr. Palma and D.P., who were not suspected of any

criminal activity, entering the front door of the main residence.  *See* ECF No. 65 ¶¶ 66 & 71.

Further, the application omitted any information related to where the "owners" of the home

lived; that the owners housed a tenant in a separate apartment with a separate exterior entrance;

and that Zelaya had never been observed entering or exiting any door other than the one leading

to the basement apartment.  Yet critically, the warrant sought permission to search the *entire* home.  *Id.* ¶ 70.  The application also sought permission to for a "no-knock" entry, or to enter without knocking and announcing their presence in the early morning hours.  In support, Officer Farmer noted Zelaya's criminal history and a seemingly unsubstantiated "belief that firearm(s) [were] located in the residence."  *Id.* ¶ 73.  Based on the affidavit, the Circuit Court for Montgomery County authorized the search warrant execution and granted "no-knock" entrance. *Id.* ¶ 75.

### B.  Execution of the No-Knock Warrant

At approximately 4:30 a.m. on September 13, 2019, MCPD broke through the door of the Palma residence with such force that it "sounded like an explosion."  ECF No. 65 ¶¶ 7 & 78. Mr. Palma confronted masked men who did not identify themselves as police.  *Id.* ¶ 79. Terrified, he ran toward D.P.'s bedroom.  *Id.* ¶ 79.  To stop Mr. Palma, an MCPD officer pushed a long-barreled rifle into his chest.  *Id.* ¶ 80.  Mr. Palma grabbed the barrel of the rifle and was tackled by several officers who pushed him onto the bed, restrained him, and then slammed his face into the wall so hard it cracked the wallboard.  *Id.* ¶¶ 80–83.  The officers also struck Mr. Palma repeatedly and eventually handcuffed him.  *Id.* ¶ 84.  One remarked, "You're lucky I didn't pop you."  *Id.* ¶ 86.  Officers also rushed Mrs. Palma to restrain her.  They applied "so much pressure to her shoulder that she feared her catheter would be ripped out."  *Id.* ¶ 89.  D.P. similarly awoke to officers brandishing guns.  They forced the girl to lie on the ground as they handcuffed her.  *Id.* ¶ 90.

For the first hour-and-a-half, MCPD officers detained each member of the Palma family separately.  ECF No. 65 ¶ 93.  After they were reunited in their family room, they were still held for hours more as MCPD ripped the house apart.  *Id.* ¶¶ 92–94.  MCPD officers knocked doors

off the hinges, broke windows, and damaged walls throughout the main residence and basement apartment.  *Id.* ¶ 98.  Notably, MCPD officers identified the Palmas as "victims" in their reports memorializing the search; yet not one officer had activated their body worn cameras during its execution, in contravention of MCPD policy.  *See* ECF No. 65 ¶¶ 100 & 101 (requiring activation of body cameras "at the initiation of a call for service that is investigative or enforcement in nature," and continuous recording until "the officer is no longer engaged" in said activity).[4]

As a result of the search, the Palmas have suffered ongoing physical and psychological pain.  ECF No. 65 ¶ 97.  Mr. Palma's injuries were so severe that he required two to three weeks off work to recuperate.  *Id.* ¶ 96.  He still experiences ongoing pain in his right knee, ankle, and shoulders from the forcible restraint.  *Id.*  D.P. is afraid to go out at night and does not trust to call the police in an emergency.  *Id.* ¶ 97.  The family, fearing another unprovoked intrusion from police, has installed security cameras in and outside their home.  *Id.*

### C.  MCPD's Lack of Policy, Guidance, and Training on the Execution of No-Knock Warrants

Although no-knock entries are authorized only for exceptional circumstances, they occurred with great frequency in the County.  In 2019, more than 77% of all MCPD search warrants executed by the SWAT team (108 of 140) were no-knock warrants.  *See* ECF No. 65 ¶ 104.  MCPD also lacked any written policies or procedures to guide officers on seeking and executing no-knock warrants.  *Id.* ¶ 105.  Indeed, MCPD's absence of such a protocol triggered remedial legislation passed in 2020 because, as the County had candidly admitted, "[a]side from making the SWAT Unit responsible for high-risk warrants, current MCPD policy does not

---

[4] Certain officers activated their cameras only after the Palmas had been detained but turned off the cameras to purportedly protect the undercover detectives on scene.  *See* ECF No. 65 ¶ 102.

appear to address procedures for no-knock warrants."  *Id.* ¶ 106 (alteration in original).

**D.  This Lawsuit**

On May 5, 2021, the Palmas filed this action.  *See* ECF No. 1.  As relevant here, the Palmas sue the individual officers involved in the execution of the search warrant under 42 U.S.C. § 1983, alleging that the officers violated their Fourth Amendment right to be free from unconstitutional searches and seizures.  *See* ECF Nos. 1 & 65.  Similarly, the Palmas have sued the County for violations arising from its policy, custom, habit, or practice of executing unconstitutional no-knock warrants.  *See* ECF No. 65.

The Palmas have amended the Complaint twice, paring down the named Defendants.  *See* ECF Nos. 11 & 65.  All individual Defendants have answered the Complaint.  The County now singularly moves to dismiss the claims as to it or alternatively to bifurcate discovery and the eventual trial.  *See* ECF No. 56.  On November 29, 2021, the Court held a recorded status conference explaining that it intended to deny the motion to dismiss and the request to bifurcate discovery, and the Court instructed the parties to commence formal discovery as to all claims. *See* ECF No. 104.  This written decision sets out the rationale for denying the pending motion.

**II.     Standard of Review**

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint.  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  A complaint need only satisfy the standard of Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007).  That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of

further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557).

In ruling on a motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and viewed in the light most favorable to the plaintiff. *Twombly*, 550 U.S. at 555. Factual allegations, however, "must be enough to raise a right to relief above a speculative level." *Id.* "'[N]aked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

### III.   Analysis

Section 1983 imposes liability on "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights[.]" 42 U.S.C. § 1983. Municipalities are "included among those persons to whom § 1983 applies if the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Accordingly, a *Monell* claim must aver sufficient facts to make plausible that "(1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional 'policy or custom' caused a violation of the plaintiff's constitutional rights." *See Shaw v. Maryland*, No. ELH-18-782, 2019 WL 4447256, at *15 (D. Md. Sept. 16, 2019). Such a policy or custom may be established through "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In the context of a police department,

the institutional failure to train its officers "about their legal duty to avoid violating citizens' rights" or to correct persistent and widespread unconstitutional practices can form the basis of a *Monell* claim.  *Id.*; *see also Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 535 (D. Md. 2020); *Jones v. Jordan*, No. GLR-16-2662, 2017 WL 4122795, at *3 (D. Md. Sept. 18, 2017).

The Palmas have pleaded three interrelated liability theories, namely, that the unconstitutional execution of a no-knock warrant is part of the department's widespread pattern and practice; that it arises from MCPD's deliberate failure to train its officers on the constitutional prerequisites of no-knock warrants; and that MCPD condoned this unconstitutional practice.  The County responds that the Complaint fails to aver sufficient facts to make any liability theory plausible.  *See* ECF No. 59-1 at 12–13.  The Court addresses each theory separately.[5]

### A.  Pattern and Practice

The Fourth Amendment requires officers to knock and announce their presence before executing a search warrant on a home.  *See United States v. Singleton*, 441 F.3d 290, 293 (4th Cir. 2006).  Only upon a showing of "exigent circumstances," may a judicial officer permit the execution of a search warrant without such advance warning—allowing, in short, a "no-knock" entry.  *See Wilson v. Arkansas*, 514 U.S. 927, 936 (1995) (holding knock-and-announce requirement part of the Fourth Amendment reasonableness inquiry).  "This standard . . . strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries."

---

[5] The Palmas bring an identical claim under the Maryland Constitution.  The state analogue to a *Monell* claim under Maryland law is known as a *Longtin* claim.  *See Rosa v. Bd. of Educ. of Charles Cnty.*, No. 11-02873-AW, 2012 WL 3715331, at *9 (D. Md. Aug. 27, 2012) (*"Longtin* claims are essentially Maryland's version of *Monell* claims."); *see also Prince George's Cnty. v. Longtin*, 419 Md. 450, 457 (2011).  Thus, *Monell* and *Longtin* claims rise or fall together, and the Court need not undertake an independent analysis of the sufficiency of the latter.  *See Krell v. Queen Anne's Cnty.*, No. JKB-18-637, 2018 WL 6523883, at *15 (D. Md. Dec. 12, 2018).

*Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

As to the pattern and practice claim, the County principally argues that the Complaint fails to allege any other instances, apart from the Palmas, where MCPD has purportedly executed a no-knock warrant without the proper showing of exigency. *See* ECF No. 56-1 at 7.  The County rightly points out that one or two isolated constitutional violations alone cannot constitute a policy or custom of unconstitutional conduct. *See Carter v. Morris*, 164 F.3d 215, 219–20 (4th Cir. 1999); *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987).  But the Complaint has done more here.  And at the pleading stage, when the factual averments state a claim "which is plausible on its face," the claim survives challenge.[6]  *See Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 403 (4th Cir. 2014) ("Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier."); *see also Est. of Bryant v. Balt. Police Dep't*, No. ELH-19-384, 2020 WL 673571, at *36 (D. Md. Feb. 10, 2020).

Specifically, the Complaint avers that in the same year MCPD executed the no-knock warrant on the Palmas, its SWAT team had also executed no-knock entries for 108 out of 140 search warrants, or 77% of the time.  *See* ECF No. 65 ¶ 104.  When considering that no-knock warrants are, by law, the *exception* to the rule that warrants must be executed upon announced presence, and when viewing the facts most favorably to the Palmas, MCPD's systemic departure from the rule goes far in plausibly averring a pattern and practice claim. *See Wilson*, 514 U.S. at

---

[6] The Palmas correctly observe that the County relies on a series of summary judgment decisions to support its dismissal motion. *See, e.g., Sparrow v. City of Annapolis*, No. WMN-16-1394, 2017 WL 3413596 (D. Md. Aug. 9, 2017); *Rhoades v. Cnty. Comm'n of Marion Cnty.*, No. 18-186, 2020 WL 807528 (N.D.W. Va. Feb. 18, 2020), *appeal dismissed sub nom. Rhoades v. Forsyth*, 834 F. App'x 793 (4th Cir. 2020); *Boyd v. Armstrong*, No. ELH-17-2849, 2019 WL 1440876 (D. Md. Mar. 29, 2019); *Whitley v. Prince George's Cnty.*, No. PWG-12-3428, 2013 WL 3659949, at *8 (D. Md. July 11, 2013).  In so doing, the County "seeks to foist an unreasonable standard upon plaintiffs' *Monell* claim." *Est. of Bryant v. Balt. Police Dep't*, No. ELH-19-384, 2020 WL 673571, at *36 (D. Md. Feb. 10, 2020).  Needless to say, Plaintiffs are not held to the same standard at the pleading stage as they are at summary judgment.

936.   Additionally, that same year, MCPD executed such warrants in a vacuum of training and guidance.  *See* ECF No. 65 ¶¶ 105–06.  Indeed, it was not until the next year, 2020, that the County passed legislation to require training on when no-knock entry is permissible.  That the County had to mandate such training certainly raises the inference that the historic use of no-knock warrants had resulted in constitutional transgressions akin to what happened with the Palmas.  Accordingly, the Palmas have plausibly alleged a pattern and practice claim against the County.

### B.  Failure to Train

A failure to train *Monell* theory requires a plausible demonstration that (1) the nature of the training was insufficient in some particularized manner; (2) the insufficiency of the training was a deliberate or conscious choice; and (3) a causal relationship existed between the failure-to-train and the injuries suffered.  *See Washington*, 457 F. Supp. 3d at 533.  As to the first element, "the plaintiff must point out 'a specific deficiency' in training, 'rather than general laxness or ineffectiveness in training.'"  *Id.* (quoting *Spell*, 824 F.2d at 1390).

Relying on *Peters v. City of Mount Rainier*, No. GJH-14-00955, 2014 WL 4855032 (D. Md. Sept. 29, 2014), the County argues that the failure to train claim fails because the Amended Complaint does not indicate any particular "deficiencies or inadequacies in the training of no-knock warrants."  *See* ECF No. 56-1 at 10.  *Peters* bears little resemblance to this case.  In *Peters*, the plaintiff stated in "bare-bones" fashion that the defendant-municipality was subject to *Monell* liability because it failed to train its officers, but the plaintiff did not explain *how* the municipality failed in that respect.  *See Peters*, 2014 WL 4855032, at *5.  There, the plaintiff alleged only that the municipality's training regimen was not sufficiently rigorous but offered no facts to make this assertion plausible.  *Id.*

That is not this Complaint.  Here, the allegations are specific to obtaining and executing no-knock warrants, and that until legislation was passed in 2020, officers had received no training on when and how no-knock warrants may be executed within the bounds of the Constitution.  *See* ECF No. 65 ¶ 106.  The Court has little trouble concluding that the Palmas have satisfied the first element of their failure to train *Monell* theory.

The County alternatively argues the Complaint does not make plausible that the failure to train had been anything more than mere negligence or oversight.  *See* ECF No. 56-1 at 12.  The Court cannot agree.  The knock-and-announce requirement remains a fundamental safeguard against constitutionally unreasonable searches and seizures.  *See Wilson*, 514 U.S. at 936.  Accordingly, no-knock entries are executed with great risk that doing so may violate these very rights.  *Some* training is essential to guide officers on when countervailing concerns of officer safety outweigh such constitutional protections.  Where, as here, the department offered no guidance on that critical issue such that legislators had to fill in the breach, it is plausible such failures were the product of a deliberate indifference to safeguarding individual liberties.  *See* ECF No. 65 ¶ 106; *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997).  The Palmas' failure to train theory, therefore, also survives dismissal.

### C.  Condonation

A condonation claim must make plausible that municipal officials engaged in "a persistent and widespread practice", the "duration and frequency of which indicate . . . actual or constructive knowledge of the conduct[,]" and that their failure to correct the misconduct was "due to their deliberate indifference."  *See Est. of Bryant*, 2020 WL 673571, at *39 (alteration in original) (quoting *Owens*, 767 F.3d at 402) (internal quotation marks omitted); *see also Jones*, 2017 WL 4122795, at *9.  In a familiar refrain, the County argues that no facts reflect a "pattern"

of misconduct, or alternatively that relevant officials had any knowledge of the same. *See* ECF No. 56-1 at 12–13. The Court rejects these arguments for the reasons previously discussed. The Complaint has averred a sufficient "pattern" of misconduct—namely that 77% of SWAT searches were no-knock entries—and given the institutional failure to train such that legislation had been passed to fill in the gaps, the County can hardly claim ignorance. *See* ECF No. 65 ¶¶ 69–75, 103–07. *Cf. Owens*, 767 F.3d at 403 ("Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will.") (quoting *Spell*, 824 F.2d at 1387). If, as the Palmas allege, the County over relied on no-knock warrants, then there is little question that "Montgomery County was aware of unconstitutional actions by MCPD officers . . . but chose to ignore such behavior." *See Garcia v. Montgomery Cnty.*, No. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013). The condonation theory, too, survives dismissal.

## IV.    Bifurcation

The Court lastly considers the County's request to bifurcate discovery and trial. Under Federal Rule of Civil Procedure 42(b), district courts may bifurcate claims to (1) promote convenience, (2) avoid prejudice, or (3) expedite and economize the judicial proceedings. *See* Fed. R. Civ. P. 42(b). As the party seeking bifurcation, the County bears the burden of proving bifurcation is necessary. *See Ryan v. City of Salem*, No. 16-0565-AC, 2017 WL 2426868, at *1 (D. Or. June 5, 2017) ("The moving party has the burden to prove that bifurcation is appropriate.") (citing cases). The Court retains broad discretion on whether to grant the motion. *See In re Hutchinson*, 5 F.3d 750, 758 (4th Cir. 1993) ("We review decisions to bifurcate trials for abuse of discretion."); *see also Beasley v. Kelly*, No. DKC 10-0049, 2010 WL 3221848, at *3

12

(D. Md. Aug. 13, 2010) (citing *Dixon v. CSX Transp., Inc.*, 990 F.2d 1440, 1443 (4th Cir. 1993), *cert. denied*, 510 U.S. 915 (1993)).

As to discovery, the Federal Rules of Civil Procedure afford plaintiffs latitude to discover information "regarding any non-privileged matter that is relevant to a claim or defense." *See Williams v. Corelogic Rental Prop. Sols., LLC*, No. PX 16-58, 2016 WL 6277675, at *2 (D. Md. Oct. 26, 2016) (citing Fed. R. Civ. P. 26(b)(1)). This is true even when such information may not be admissible at trial. *Id.* Accordingly, the Palmas should be given "the opportunity that all litigants before this Court ordinarily have -- to use the means provided by the Federal Rules to try to prove [their] claim." *See Lopez v. City of New York*, No. 20-2502 (LJL), 2021 WL 2739058, at *2 (S.D.N.Y. July 1, 2021).

The Court has been given no true grounds to conclude that bifurcation of trial or discovery is warranted. The parties have "work[ed] collaboratively" to complete discovery efficiently, with the Palmas dismissing individual officers early, upon learning of their lack of involvement in the Palma search. *See* ECF No. 100. The parties also worked together to propose an efficient discovery schedule for the individual and *Monell* claims and have not needed any Court intervention. *See* ECF No. 104. Thus, nothing presently concerns the Court that discovery, absent bifurcation, will become "voluminous" or unwieldy. The motion to bifurcate discovery is denied.

Likewise, the Court will not bifurcate trial at this juncture. The *Monell* claims are straightforward and integrated with the facts and circumstances of the Palma incident. Moreover, the Court has yet to receive summary judgment motions which may narrow or alter the scope of the case. *See Marcum v. Scioto Cnty.*, No. 10-790, 2012 WL 2674303, at *3 (S.D. Ohio July 5, 2012) (explaining that the *Monell* claim would never reach the jury "if the County

defendants are successful at the summary judgment stage"). Put plainly, if the Palmas survive summary judgment on the individual and the *Monell* claims, then necessarily both claims are for the jury to decide. And in that circumstance, bifurcation will augment, not reduce, the time and resources necessary to try the matter. *Cf. Marcum*, 2012 WL 2674303, at *2 (explaining that the municipality's judicial economy argument "relies on the assumption that plaintiff will not be successful on her constitutional claims against the individual officers"). Far from advancing judicial economy and convenience, this approach would invite redundancy and waste.

The County lastly maintains, with little explanation, that both the individual officers and the County will be respectively "prejudiced" absent bifurcation. This fear is, at best, speculative. *See* ECF No. 56-1 at 16. Moreover, any such concerns can be adequately addressed through in *limine* proceedings and cautionary jury instructions designed to mitigate any prejudicial spillover of claims. *See Est. of Alderman v. City of Bakersfield*, No. 16-00994-DAD-JLT, 2018 WL 4156740, at *2 (E.D. Cal. Aug. 28, 2018); *see also Rodriguez v. City of Chicago*, 429 F. Supp. 3d 537, 543 (N.D. Ill. 2019) (citing cases for proposition that any prejudice inherent to a unitary trial can be cured through limiting instructions, motions in *limine*, and the Federal Rules of Evidence); *Marcum*, 2012 WL 2674303, at *3 (explaining that trial courts can use special verdict forms, jury charges, and limiting instructions to reduce the risk of juror confusion and prejudice); *Cadiz v. Kruger*, No. 06 C 5463, 2007 WL 4293976, at *6 (N.D. Ill. Nov. 29, 2007) ("The fact that a unitary trial would expose jurors to evidence relevant to the *Monell* claim and not to the claims against the individual officers does not automatically mean that bifurcation is in order.").

Thus, this Court remains unconvinced that bifurcation is necessary here.[7]  The motion to bifurcate trial is likewise denied.

## V.    Conclusion

For the reasons above, the Court DENIES the motion to dismiss or, in the alternative to bifurcate discovery and trial.  *See* ECF No. 56.  A separate Order follows.


April 12, 2022 _____                              _____/s/_____
Date                                                        Paula Xinis
                                                            United States District Judge

---

[7] The Court acknowledges that many others in this District often grant bifurcation of similar claims.  *See, e.g.*, *Grim v. Balt. Police Dep't*, No. ELH-18-3864, 2020 WL 1063091 (D. Md. Mar. 5, 2020); *Dodson v. Prince George's Cnty.*, No. GJH-13-02916, 2014 WL 4799032, at *2 (D. Md. Sept. 25, 2014) (collecting cases); *Beasley v. Kelly*, No. DKC 10-0049, 2010 WL 3221848 (D. Md. Aug. 13, 2010).  In this Court's view, however, bifurcation is neither "appropriate" or "desirable" here.  *Grim*, 2020 WL 1063091, at *5.