**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **PALMA ET AL.,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **Civil Action No. 8:21-cv-01090-PX** |
| **v.** | * | |
| | * | |
| **MONTGOMERY COUNTY,** | * | **\*SEALED\*[1]** |
| **MARYLAND ET AL.,** | * | |
| | * | |
| **Defendants.** | * | |
| | *** | |

## MEMORANDUM OPINION

This civil rights action arises out of a "no-knock" search warrant executed at the

Plaintiffs' home in the early morning hours of September 13, 2019.  The parties have engaged in

extensive discovery and Defendant-Officers Robert Farmer, Christopher Murray, Matthew Dove,

Scott MacGregor, as well as Montgomery County, Maryland ("the County"), have moved for

summary judgment in their favor.  Likewise, Plaintiffs Hernan Palma, Lilian Palma, and their

minor daughter D.P. ("the Palmas"), have cross moved for summary judgment in their favor.

ECF Nos. 133 & 138.  The motions are fully briefed, and no hearing is necessary.  D. Md. Loc.

R. 105.6.  For the reasons that follow, the Palmas' motion is denied, and Defendants' motion is

granted in part and denied in part.

---

[1] Because the parties filed certain exhibits under seal, the Court has provisionally sealed this Memorandum Opinion to give the parties an opportunity to request what, if any, portions of the Opinion should remain under seal permanently.  Accordingly, within seven days from the date of this Opinion and the accompanying Order, the parties shall propose redactions to this Opinion.  Failure to provide any such proposed redactions will result in the unsealing of the entire Memorandum Opinion without further warning.

## I.    Factual Background

Since 2005, Hernan and Lilian Palma have resided in a modest, one-story brick home in Silver Spring with their teenage daughter, D.P.  J.A. 78, J.A. 98, J.A. 439. [2]  The Palmas live on the main level, which includes three bedrooms, a living room, a dining room, a bathroom, and a kitchen.  J.A. 116, J.A. 333, J.A. 420, J.A. 439, J.A. 461.  The basement includes an apartment with a separate exterior side entrance.  J.A. 115, J.A. 368.  Although an interior door allows access from the main level to the basement, the Palmas keep that door locked and do not access the basement apartment.  J.A. 133, J.A. 384, J.A. 393-394, J.A. 454, J.A. 477.  The apartment does not have a separate address or its own mailbox, and no public records reflect that the home includes a basement apartment.  *See* J.A. 89–90, J.A. 115.

In 2019, the Palmas entered into an oral agreement to rent the basement apartment to Clelia Zelaya.  J.A. 114–115, J.A. 335, J.A. 394, J.A. 454, J.A. 477.  The Palmas knew that Ms. Zelaya's son, David Zelaya (hereinafter "Zelaya"), attended college at the University of Maryland and that he would stay at the apartment on occasion.  J.A. 114–115.  Save for the times when Ms. Zelaya would bring the Palmas her rent money or retrieve mail, the Palmas and the Zelayas did not interact.  J.A. 114–115, J.A. 384–385, J.A. 394, J.A. 454, J.A. 477.

### A.    MCPD's Investigation

In May of 2019, Officer Robert Farmer of the Montgomery County Police Department ("MCPD") began investigating Zelaya for suspected narcotics and firearms offenses.  J.A. 26–28, J.A. 319.  The investigation started when a confidential informant ("CI") with proven reliability told Officer Farmer that Zelaya "sells marijuana, cocaine and possesses multiple

---

[2] The parties have helpfully submitted a Joint Appendix to which the Court cites as "J.A."  ECF Nos. 135, 135-1, & 135-2.

firearms." J.A. 28.  *See also* J.A. 507, J.A. 530 (describing Officer Farmer as "the lead investigator in the narcotics and firearms investigation of David Zelaya").  The CI also provided Officer Farmer with Zelaya's social media on which Zelaya posted videos of himself transporting firearms in his vehicle and posing with firearms inside a home.  J.A. 75, J.A. 86.  Officer Farmer also knew that because Zelaya had been previously convicted of robbery, his current firearm possession subjected him to separate felony prosecution.  J.A. 35–36, J.A. 41.

On August 14, 2019, Officer Farmer had the CI buy 10 grams of marijuana from Zelaya.  J.A. 39, J.A. 677–682.  Officer Farmer also obtained court approval to install a tracking device on Zelaya's vehicle and a pen register on Zelaya's cell phone.  J.A. 37, J.A. 42, J.A. 319.  From the tracking devices, Officer Farmer learned that Zelaya spent time at the homes of his grandmother, mother, father, and girlfriend.  J.A. 42–44.  Officer Farmer set up surveillance at each location, but only observed Zelaya enter and exit the Palma residence through a side door leading into the basement.  J.A. 45, J.A. 509.  Officer Farmer photographed Zelaya coming and going from the exterior side door, and on one occasion, observed Zelaya go to the backyard.  J.A. 21, J.A. 29, J.A. 32, J.A. 44.  Officer Farmer also confirmed that Zelaya had two vehicles registered in his name and parked both overnight in front of the residence.  J.A. 29, J.A. 69.  On one occasion, Officer Farmer saw Zelaya exit the home and move a package from one car to another.  J.A. 89.  Officer Farmer concluded that Zelaya likely lived at the residence.  J.A. 89.

Officer Farmer also saw a man, woman, and younger girl entering and leaving the house solely through the front door.  J.A. 44, J.A. 48–49; *see also* ECF No. 138-3 at 5, 7.  Officer Farmer confirmed through land records that Hernan and Lilian Palma owned the home.  J.A. 24.  Although the record is not altogether clear on this point, it appears that Officer Farmer assumed

that the couple he saw enter the home through the front door were the Palmas, and that they lived at the residence as well.  J.A. 21–24.

  **B.**  **Search Warrant Application**

  Based on his investigation, Officer Farmer applied to a Montgomery County District Court for a warrant to search the Palma residence and Zelaya's two vehicles.  J.A. 78.  In the affidavit supporting the warrant application, Officer Farmer detailed in chronological order his investigation of Zelaya beginning with the "hundreds of videos" from Zelaya's Snapchat account showing Zelaya "shooting firearms, carrying multiple firearms/handguns in his vehicle while driving and filming the drugs he is trafficking," and "holding an AR-15 style rifle, rifle ammunition and high-capacity drum magazines for handguns and AR-15 style rifles."  J.A. 84.  The affidavit also described the CI's personal observations of Zelaya with guns and drugs and the CI's undercover purchase of marijuana from Zelaya.  J.A. 87, J.A. 92.

  The affidavit next described the information confirming Zelaya's connection with the Palma home, to include that two vehicles registered to Zelaya had been "consistently" parked in front of the Palma residence overnight.  J.A. 88–89.  Officer Farmer also described his personal observations of Zelaya routinely using the side door to enter and exit the home from the basement.  J.A. 89.

  Officer Farmer also included in the affidavit the results of his records check regarding ownership of the home.  Officer Farmer specifically identified Hernan and Lilian Palma as the record owners per the tax assessment records, but also emphasized that he had no prior contact with the owners for fear of compromising the investigation.  J.A. 89–90.  Nothing else suggests that Officer Farmer had any advance contact with the Palmas, as he did not know many details about them prior to swearing out the warrant.  J.A. 53 (Officer Farmer testifying that at the time

4

of the search he did not "know whether [the Palmas] were innocent or not"); J.A. 55 (Officer

Farmer had no advance information on whether the Palmas had been "involved in criminal

activity."); J.A. 74 (Officer Farmer did not know the age of the Palmas' daughter); J.A. 74

(Officer Farmer did not know where occupants lived in residence); J.A. 75 (Officer Farmer did

not know the relationship, if any, between Zelaya and the Palmas); J.A. 76 (Officer Farmer

confirming that he learned after the execution of the warrant that the Palmas were "an innocent

family.").

     As to the manner of executing the warrant, the affidavit requested a "no knock" entry.

J.A. 92.  Although the general rule is that law enforcement must knock and announce their

presence before executing a search warrant, officers may seek permission from the court to enter

the home unannounced when doing otherwise "would place those officers in serious danger."

J.A. 92.  In addition to the information regarding Zelaya's possession of firearms, Officer Farmer

summarized Zelaya's criminal history, to include his alleged participation in a home invasion

robbery where the victims had been forced into the bathroom at gunpoint.  J.A. 711–713.

Having this information, the state court authorized the execution of a no-knock warrant.  J.A.

740–741.

### C.    Executing the Warrant

     While the officers waited for the warrant to be approved, Officer Farmer and Sergeant

Matthew Domer of the MCPD's Special Operations Division, Tactical Unit (the "Tactical Unit")

began preparing their entry plan.  J.A. 27–29, J.A. 319, J.A. 530.  The Tactical Unit is

responsible for executing "no-knock" search warrants.  J.A. 14, J.A. 27 J.A. 358, J.A. 530.  In an

email to Sergeant Domer, Officer Farmer stated that he wanted to "hit the house on Friday."  J.A.

319.  Officer Farmer also forwarded to Sergeant Domer several photos of Zelaya and the target

residence, as well as a completed "threat matrix" form.  J.A. 29, J.A. 319–324.  The threat matrix

form acts as "a guide in determining what resources are necessary to minimize the risks of

warrant service."  J.A. 324.  The form is also intended to "provoke consideration of issues

relating to officer safety and the safety of the community."  J.A. 324.  In the threat matrix form,

Officer Farmer identified as aggravating such danger factors as Zelaya's history of firearm

possession and law enforcement's "intelligence of firearms at the target location."  J.A. 324.

Tactical Unit member, Officer Edward Cochran, next designed a "raid plan," for the entry

team.  J.A. 161, J.A. 164–165, J.A. 168–169.  The plan included directions to the residence,

aerial photos of the home and of Zelaya, and a "layout diagram" of the home's interior.  J.A. 66,

J.A. 165, J.A. 168–169, J.A. 325–334.  The interior plan depicted a one-level living area with

three bedrooms off a common hallway.  J.A. 333.  For the basement, the diagram simply

indicated: "Basement Unknown."  J.A. 166, J.A. 333.  Sergeant Brian Tupa, the entry team

leader, reviewed the raid plan and assigned specific officers roles in executing the warrant.  J.A.

174–178; *see also* J.A. 345–346 ("Search Warrant Plan of Service").

On the morning of the warrant's execution, the Tactical Unit met at the MCPD station for

briefing.  J.A. 54–55, J.A. 169, J.A. 209.  This included Officers Christopher Murray, Matthew

Dove, and Scott MacGregor.  J.A. 184–85, J.A. 208–209, J.A. 239.  Officer Farmer reviewed

with Tupa "everything [he] had seen at the house regarding all the residents, the doors they had

accessed, the sides, the back, the front."  J.A. 55.  Officer Farmer also summarized the

investigation to date, and Officer Cochran reviewed the details of the entry per the raid plan.

J.A. 239.  The entry team also discussed that "potentially at least four" individuals, including a

"teenager," lived at the target residence.  J.A. 185.

6

At approximately 4:30 a.m., the Tactical Unit broke down the Palmas' front door with an 80-pound battering ram.  J.A. 215–216, J.A. 241–44, J.A. 336, J.A. 353–355.  To the sleeping Palmas, the entry sounded like an explosion.  J.A. 385, J.A. 395–396, J.A. 441.  About 20 officers rushed into the home wearing full tactical gear.  J.A. 187–188, J.A. 216–217, J.A. 353, J.A. 485–486.  Seconds later, Officers Murray, Dove, and MacGregor encountered Mr. Palma. J.A. 188–189.  The officers and Mr. Palma each describe the ensuing events differently, so each person's account merits separate discussion.

Immediately after hearing an explosion, Mr. Palma saw "shapes of humans coming at [him]."  J.A. 119.  It was dark and the officers were in tactical gear, so Mr. Palma thought he was being robbed.  J.A. 119.  He began "yelling, like in terror, like, panic yelling."  J.A. 119.  Mr. Palma also felt "something hard" on his chest and he reflexively "grabbed it and . . . pushed on it," and the person attached to it "kind of went back."  J.A. 119.  Mr. Palma tried to get to his daughter's room but "another person grabbed [him]" and "started pushing [him] back."  J.A. 119. More than one person "probably kick[ed] him as they walk[ed] . . . or stepped on [his] foot as they walked."  J.A. 119.  Mr. Palma describes that he "wasn't really fighting because it was almost impossible."  J.A. 119.  Mr. Palma was next thrown onto the bed and several officers applied pressure with such force that he could not move.  J.A. 120.  Mr. Palma recalls the officers demanding that he give them his hands.  J.A. 121.  He responded, "I can't," because the officers had pinned his body such that he could not move and was in immense pain.  J.A. 121. Mr. Palma also recalls officers punching his body as he continued to try to tell them he could not move.  J.A. 121.

Eventually, according to Mr. Palma, he was restrained with officers on either side of him holding down his arms.  J.A. 120.  At that point, although Mr. Palma was "open," with "no

defense," another officer "came and straight punched [Mr. Palma] in the face."  J.A. 120.  Mr. Palma fell backwards, and the officers next "flipped" Mr. Palma face down on the bed.  During that process, the officers pushed Mr. Palma "so hard against the wall that [he] ended up with his face breaking the drywall."  J.A. 120.

The three officers involved in Mr. Palma's restraint tell of the incident differently from each other and from Mr. Palma.  Officer Murray was the sixth officer in the "stack," or the line of Tactical Unit officers who entered the home.  J.A. 180, J.A. 187.  Officer Murray moved to the bedroom where Mr. Palma had been sleeping.  J.A. 188.  As he crossed the threshold into the room, Mr. Palma grabbed Officer Murray's rifle, which prompted Officer Murray to push Mr. Palma in the chest and yell, "Police, get back" or "Police, get down."  J.A. 188–189.  When Mr. Palma did not comply, Officer Murray grabbed Mr. Palma and tried to take him to the ground.  J.A. 189.  Mr. Palma, in turn, grabbed Officer Murray and pushed on him, until each was pushing on the other.  J.A. 189.  As Officer Murray describes it, he and Mr. Palma were at a "stalemate," with Officer Murray screaming for Mr. Palma to get down on the ground, and Mr. Palma yelling and refusing to comply.  J.A. 189.  At this point, Officer Murray and Mr. Palma fell onto the bed in such a manner that Officer Murray's rifle and rifle sling became trapped under Mr. Palma's body, pinning Officer Murray to Mr. Palma.  J.A. 189.  From this position, Officer Murray could see other officers struggling with Mr. Palma.  J.A. 189.  After an officer punched Mr. Palma in the face, the officers were able to handcuff Mr. Palma and free Officer Murray.  J.A. 189.

Officer Dove, the seventh officer in the stack, recalls entering the home immediately behind Officer Murray.  J.A. 213.  He saw Officer Murray's head snap back as Officer Murray crossed the threshold into the bedroom and next saw Officer Murray and Mr. Palma physically

tussle.  J.A. 217.  Officer Dove also saw Officer MacGregor enter the room and the officers together worked to "get Mr. Palma onto the bed."  J.A. 219.  Officer Dove describes Mr. Palma as having placed his hands under his chest to avoid being cuffed.  *Id*.  At that point, Officer Dove started punching Mr. Palma in the ribs, causing Mr. Palma to eventually present his hands.  J.A. 219.  Officer Dove does not describe Officer Murray having been pinned to Mr. Palma, nor does he recall anyone else hitting Mr. Palma once the officers had control of Mr. Palma's arms. J.A. 221.

Officer MacGregor, the seventeenth officer to enter the house, first heard someone say, "he grabbed my gun."  J.A. 244.  As Officer MacGregor approached the bedroom, he saw Officers Murray and Dove "in a physical struggle" with Mr. Palma.  J.A. 244.  Mr. Palma was "up against the bed" and had one officer on each side who were trying to gain control of Mr. Palma's hands.  J.A. 244.  Mr. Palma, according to Officer Murray, was laying on the bed, face up, resisting officer commands.  J.A. 244.  Each of the other officers had a rifle in a sling and was close to Mr. Palma.  J.A. 244.  But Officer MacGregor does not describe Officer Murray as pinned to Mr. Palma, the way Officer Murray had told it.  Officer MacGregor admits that he punched Mr. Palma twice in the face because Mr. Palma had been "actively resisting."  J.A. 244–246, J.A. 543.

The officers eventually placed Mr. Palma in cuffs and sat him on the bed.  J.A. 125, J.A. 247, J.A. 441, J.A. 485, J.A. 583.  Mr. Palma could hear screams and yelling from his daughter's room, and so he kept asking the officers what they were doing to his family.  J.A. 122.  However, "[n]obody would say anything."  J.A. 122, J.A. 441.  Mr. Palma told the officers that his hands hurt from the cuffs, to which Officer Murray replied, "chill out, you're out of

control." J.A. 192–193. Officer Murray also told Mr. Palma that he was lucky Officer Murray had not "popped" him. J.A. 441.

As for Mrs. Palma, she woke to screams, yelling, and the battering ram knocking down the front door. J.A. 396. Initially, she stayed motionless in her bed, but soon "big guys in black uniform[s]" with "big guns" surrounded her bed. J.A. 396. One officer zip-tied Mrs. Palma's hands behind her back. J.A. 396. She told the officers that the restraint hurt because of her dialysis port, so the officers undid the restraints. J.A. 396–397, J.A. 466–467.

D.P. also woke with a start when the officers entered the house. J.A. 385. Several officers came to her bedroom, surrounded her at gunpoint, tied her hands behind her back, and searched her room. J.A. 386–387, J.A. 422–423. D.P. was not certain how many minutes she was on the ground for, but eventually, the officers permitted her to sit on her bed. J.A. 387.

While law enforcement searched the home, the Palmas were detained. J.A. 125, J.A. 388, J.A. 400. Each was initially confined to a different bedroom, but eventually they were moved to the living room. J.A. 123–127, J.A. 257, J.A. 262–263, J.A. 388, J.A. 421–423, J.A. 440–442. Officer Farmer explained to the Palmas why they were executing the warrant, but Officer Farmer did not provide a copy of the warrant. J.A. 128–129, J.A. 442. Eventually, Mr. Palma was allowed to dress and go to work. J.A. 127–128. The officers concluded the search about 30 minutes after Mr. Palma left the house. J.A. 99–100, J.A. 118, J.A. 127, J.A. 389, J.A. 401, J.A. 440–442.

Officers also secured Zelaya and his mother in the basement. J.A. 340. Once the officers figured out that the Palmas had no relationship with Zelaya, they concentrated their search on the basement. J.A. 68–69. Officer Farmer, in fact, memorialized in a post-search report that Zelaya

was "using the residence of an innocent family who ended up suffering minor injuries and financial hardships during the raid." J.A. 69–71, J.A. 337.

Given the manner of entry and search, the house took a beating. Several doors were broken, as was the interior wall where officers had slammed Mr. Palma's face into the drywall. J.A. 130–131, 402–403. Mrs. Palma's dialysis machine also was damaged but still functional. J.A. 401, J.A. 403.

The Palmas, too, suffered injuries. Mr. Palma initially could not eat, yawn, or smile, as his jaw had been badly injured from the officers' blows. J.A. 131. His body also hurt and was badly bruised in the days thereafter. J.A. 102, J.A. 131. His shoulder pain lasted for months. J.A. 102, J.A. 445. Mr. Palma was also diagnosed with posttraumatic stress disorder ("PTSD") for which he required biweekly counseling from the staff therapist for Montgomery County Fire and Rescue. J.A. 557. Mrs. Palma and D.P., too, experienced similar mental anguish. Shortly after the incident, Mrs. Palma was diagnosed with PTSD. J.A. 600, J.A. 617-619. And D.P. experienced PTSD related symptoms but has since recovered. J.A. 665.

### D.  MCPD's Use of No-Knock Warrants

The Palmas also allege that the execution of the no-knock warrant at their home stems from a larger unconstitutional pattern and practice of the MCPD's executing no-knock warrants without proper justification. No meaningful dispute exists that the MCPD has made robust use of no-knock warrants in the past. Of the 508 search warrants executed between 2017 and 2019, 68.7 percent were no-knock entries. J.A. 359.

During that same time, officers received minimal training on no-knock warrants. *See* J.A. 263. New officers learned essentially that "[a]ll warrants are Knock and Announce unless you have a 'No Knock' warrant." J.A. 263–264, J.A. 317, J.A. 347, J.A. 410. Officers were also

instructed that the propriety of a no-knock warrant depends entirely on the specific

circumstances of the given search. J.A. 413 ("General terms are not appropriate. You have to be

able to articulate why in this particular instance, this particular location, a no-knock is

appropriate.").

First-line supervisors and newly promoted sergeants received additional training on

executing no knock warrants. J.A. 155–156. The materials instruct officers to "[a]lways apply

for a 'No knock exception' if the case warrants it." J.A. 348. Captain Brian Dillman describes

several "internal mechanisms" that are in place to ensure that no-knock warrants are not

"overused." J.A. 152. Most notably, Function Code 714, effective December 3, 2014,

constitutes MCPD's departmental directive for search and seizure warrants. J.A. 268. This

policy instructs officers that they must "first announce their authority and purpose loudly" when

executing a warrant unless they have obtained a no-knock warrant. J.A. 268. Function Code 714

also articulates those facts to support a no-knock warrant as target or occupants' "propensity for

violence;" if "weapons" are suspected to be in the residence; or if there exists the potential for

the destruction of evidence. J.A. 273. The policy further directs officers to present those facts in

the affidavit supporting the warrant, and expressly mandates the completion of the threat matrix

form to "assess the risk factors related to all search warrants involving a structure or dwelling."

J.A. 273, J.A. 276.

The County Council, for its part, remained concerned about the widespread use of no-

knock warrants given the relative lack of relevant written policies and procedures. J.A. 684; *see*

*also* ECF No. 138-3 at 14–18. Accordingly, in June of 2020, the County introduced Expedited

Bill 27-20 (the "Bill") to establish use-of-force policies, including the execution of no-knock

warrants.  J.A. 683–685.  The Bill passed on July 29, 2020, and took effect the following month.
J.A. 685, J.A. 695–696.

The Bill expressly limits the use of no-knock warrants to circumstances where "other
methods of serving a warrant, including methods which would mitigate risk, have been
considered and have been determined to pose unacceptable risk to the life or safety of executing
officers or another person; or be futile."  J.A. 692.  The Bill also requires the MCPD to report
annually on the department's use of no-knock warrants.  J.A. 693.  MCPD, however, had yet to
issue such a report as of August 2022.  *Compare* J.A. 360, *with* ECF No. 138-3 at 17-18 ¶¶ 22–
24.  Nonetheless, data gathered by other means reflects that in the months since the passage of
the Bill (January 2021 to June 2022), the Tactical Unit executed only 36% percent of all warrants
as no-knock entries.  J.A. 359.

## II.    Procedural History

On May 5, 2021, the Palmas filed suit in this Court against the County, the MCPD, and
an array of named and unnamed officers.  *See generally* ECF No. 1.  Initially, the Palmas fronted
eleven separate claims under the United States Constitution, the Maryland Constitution, and the
Local Government Tort Claims Act ("LGTCA").  ECF No. 1 ¶¶ 88–188.  The Palmas
subsequently amended the Complaint twice to identify the involved officers with more
particularity.  ECF Nos. 11 & 65.  The Second Amended Complaint also dropped MCPD as a
defendant and added as individual defendants, Officers Murray, Dove, and MacGregor.  *See
generally* ECF No. 65.

The individual defendants answered the Second Amended Complaint.  ECF Nos. 68–97.
The County moved to dismiss all claims as to it, or alternatively to bifurcate discovery and trial.
ECF No. 56.  On November 29, 2021, the Court explained during a recorded status conference

that it intended to deny the motion and directed the parties to begin discovery.  ECF No. 104.  On

April 12, 2022, the Court formally denied the County's motion and explained its rationale.  ECF

Nos. 114 & 115.  The Court focused principally on the Palmas' "three interrelated liability

theories, namely, that the unconstitutional execution of a no-knock warrant is part of the

department's widespread pattern and practice; that it arises from MCPD's deliberate failure to

train its officers on the constitutional prerequisites of no-knock warrants; and that MCPD

condoned this unconstitutional practice."  ECF No. 114 at 8.  The Court concluded that all three

theories survived dismissal and rejected the County's request to bifurcate discovery and trial.  *Id.*

at 14–15.

On July 13, 2022, the Palmas amended the Complaint for the final time.  *See generally*

ECF No. 123.  The Third Amended Complaint asserts five causes of action brought pursuant to

42 U.S.C.  § 1983:  Count I, termed "Improper Warrant," alleges that Officer Farmer knowingly

omitted "salient facts," which misled the judicial officer who issued the warrant.  *Id.* ¶¶ 108–20.

Count II, brought against all individual officer Defendants, alleges that the Palmas were

unconstitutionally seized based on the improperly issued warrant.  *Id.* ¶¶ 121–26.  Count III

charges the County with implementing an unconstitutional official policy, custom, and practice

of overusing no-knock warrants, which resulted in the Palmas' unconstitutional search and

seizure.  *Id.* ¶¶ 127–40.  Count IV alleges that Officers Murray, Dove, and MacGregor used

excessive force against Mr. Palma during the execution of the warrant.  *Id.* at  ¶¶ 141–51.  The

remaining counts allege companion claims under the Maryland Declaration of Rights and the

LGTCA, and Mr. Palma brings a common law battery claim against Officers Murray, Dove, and

MacGregor as well as the County in its supervisory capacity.  *Id.* ¶¶ 152–202.

14

Defendants now move for partial summary judgment.  Officers Dove and MacGregor do not challenge that the excessive force and battery claims must proceed as to them.  *See generally* ECF No. 133.  Defendants otherwise contend that all other claims must be decided in their favor as a matter of law.  *Id.* at 4.  The Palmas likewise do not seek judgment on the excessive force claims.  They move for judgment in their favor on all constitutional claims challenging the manner and execution of the warrant (Counts I – III and V, VI, IX).  *See generally* ECF No. 138.

The cross-motions for summary judgment are now ripe for resolution.  *See* ECF Nos. 140 & 143.  For the following reasons, the Court grants Defendants' motion as to the warrant-related claims and denies Officer Murray's motion.  The Court also denies the Palmas' motion.

## III.    Standard of Review

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56I).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  But "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'"  *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna*

15

*Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)).  If the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is warranted.  *Celotex*, 477 U.S. at 322.

"Where, as here, cross motions for summary judgment are filed, a court must 'evaluate each party's motion on its own merits, taking care [in each instance] to draw all reasonable inferences against the party whose motion is under consideration.'"  *Snyder ex rel. Snyder v. Montgomery Cnty. Pub. Sch.*, No. DKC 2008-1757, 2009 WL 3246579, at *5 (D. Md. Sept. 29, 2009) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).  The Court must deny both motions if it finds a genuine issue of material fact precludes resolution, "[b]ut if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  10A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2720 (4th ed. 2020).

## IV.    Analysis

The Court first turns to the cross motions for summary judgment on Counts I, II, III, V, VI and IX, which all concern the purportedly "invalid warrant."  Count I alleges a violation of the Fourth and Fourteenth Amendments to the United States Constitution, ECF No. 123 ¶¶ 109, 119, and Count VI brings companion state constitution claims[3] against Officer Farmer based on his omitting information from the affidavit which induced the reviewing judge to approve a search of the entire home instead of just the basement, *id.* ¶ 165.  The claim also asserts that the

---

[3] The federal and state constitutional claims are considered in *pari materia*, subject to the same legal analysis. *Jeffries v. Ayoub*, No. 8:17-cv-02973-PX, 2019 WL 3306017, at *4 n.6 (D. Md. July 23, 2019) (quoting *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 377 (D. Md. 2018)), 354 Md. 18, 43–44 (1999).

same omissions "negated any need to excuse the knock-and-announce rule." *Id.* ¶ 115. Counts II and IX are premised on the same factual assertions and aver that the Palmas had been unlawfully "seized" based on the invalid warrant. *Id.* ¶¶ 124, 199. Last, Count III and V essentially allege that the County's pattern and practice of indiscriminate overuse of "no-knock" warrants to make unannounced entry caused the Palmas' asserted constitutional injuries arising from the invalidly obtained warrant. *Id.* ¶¶ 136, 161. Simply stated, all six claims rise or fall on whether the Palmas have adduced sufficient evidence to support the "invalidity" of the warrant, so the Court analyzes the claims together.

### A.    Invalid Warrant

The Palmas posit a narrow liability theory perhaps best defined by what they do not contest. The Palmas do not contest that the warrant affidavit articulated sufficient probable cause to search at least part of the home based on Zelaya's drug and gun activity while residing there. ECF No. 138-2 at 42 ("We assume, arguendo, that there was probable cause to search Zelaya's home for evidence of crime."). The Palmas argument instead amounts to this: Officer Farmer omitted certain information which, if included, would have limited the scope of the warrant to just the basement apartment. *Id.* at 39. Defendants, in response, contend that no rational factfinder could conclude Officer Farmer's omissions were material, or that the facts were omitted with reckless disregard for the truth or falsity of the affidavit. ECF No. 133-1 at 22–32.

In assessing the viability of the Palmas' "invalid warrant" assertion, the Court looks to the protections inherent in the Fourth Amendment. The Fourth Amendment guards against "unreasonable government intrusion" of places where persons enjoy a reasonable expectation of privacy — chief among them, one's home. *Kyllo v. United States*, 533 U.S. 27, 31 (2001). For a

search warrant to pass constitutional muster, it must be based "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  An application for a search warrant, therefore, must be supported by an affidavit submitted to a reviewing judicial officer who makes the probable cause determination based on that affidavit.  *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) (citations and quotation marks omitted).  This process "ensures that the search will be carefully tailored to its justifications and will not take on the character or the wide-ranging exploratory searches the Framers intended to prohibit."  *Maryland v. Garrison*, 480 U.S. 79, 85 (1987).

For the reviewing judge, the probable cause inquiry focuses on the place to be searched and asks whether that place contains evidence of a crime.  Sufficient facts must establish "the nexus between the place to be searched and the items to be seized," looking to "the nature of the item and the normal inferences of where one would likely keep such evidence." *United States v. Anderson*, 851 F.2d 727, 729, (4th Cir. 1988).  As with all probable cause determinations, establishing this nexus between the target location and the suspected evidence turns on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  Thus, it may be wholly reasonable to infer that incriminating evidence will "be present even if the affidavit contains no factual assertions directly linking the items sought to the [suspect's] residence." *United States v. Servance,* 394 F.3d 222 (4th Cir.), *rev'd on other grounds*, *Servance v. United States*, 544 U.S. 1047 (2005).

To assess whether the Palmas have generated any evidence to sustain the invalid warrant claim, the Court employs the standard set forth in *Franks v. Delaware*, 438 U.S. 154 (1978).  *See*

*also Evans v. Chalmers*, 703 F.3d 636, 649–50 (4th Cir. 2012); *Miller v. Prince George's Cnty.*, 475 F.3d 621, 627–28 (4th Cir. 2007); *Freeland v. Childress*, 177 F. Supp. 2d 422, 430 (D. Md. 2001).  Although the *Franks* inquiry usually functions in criminal matters as the gateway to challenging the admissibility of evidence seized pursuant to a warrant, civil suits alleging personal injury arising from the execution of an unconstitutionally obtained warrant borrow its requirements.  *Evans*, 703 F.3d at 650 (quoting *Franks*, 438 U.S. at 155–56).

 *Franks* asks two questions: (1) did the officer-affiant "'knowingly and intentionally or with a reckless disregard for the truth'" either make false statements or omit facts from his affidavit such that the affidavit was misleading; and (2) were the false statements or omissions "'material,' that is, 'necessary to'" the reviewing judge's probable cause determination.  *Evans*, 703 F.3d at 650 (quoting *Franks*, 438 U.S. at 155–56).  *See also United States v. Lull*, 824 F.3d 109, 115 (4th Cir. 2016); *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990).  Where, as here, the claim turns on factual *omissions* from the affidavit, the *Franks* inquiry focuses on whether the officer "omit[ted] material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading."  *Lull*, 824 F.3d at 115 (quoting *Colkey*, 899 F.2d at 300).

 Importantly, for the omissions to have been knowingly or recklessly made, the omitted facts must have been known by the officer at the time he sought the warrant.  *See United States v. Wharton*, No. ELH-13-0043, 2014 WL 3943358, at *14 (D. Md. Aug. 12, 2014) ("For that fundamental protection to have any value, the police must be candid with the judge and tell the judge about the facts they know that are material to determining probable cause and the scope of the probable cause.").  The officer could not have knowingly or recklessly omitted information that he never knew in the first place. *United States v. Pulley*, 987 F.3d 370, 379 (2021).  And so,

the Court must be careful not to import into this analysis facts which became known to the officer during or after the search.

The Palmas argue Officer Farmer recklessly omitted from his affidavit (1) that Zelaya only accessed the home through the side door leading to the basement and never the front door; (2) that the Palmas only used the front door; (3) that the officer never suspected the Palmas of any criminal conduct. ECF No. 138-2 at 39–40. The Palmas further contend that Officer Farmer omitted these facts with the aim to "mislead" the reviewing judge into authorizing the search warrant for the entire home instead of just the basement. *Id*. at 40. For the following reasons, even when the evidence is viewed most favorably to the Palmas, the claim does not survive challenge.

The Court begins with whether the omitted facts were material to the probable cause determination. "[T]o be material under *Franks*, an omission must do more than potentially affect the probable cause determination: it must be '*necessary* to the finding of probable cause.'" *Colkley*, 899 F.2d at 301 (quoting *Franks*, 438 U.S. at 156) (emphasis added). To so determine, the Court must add back into the affidavit those facts which the officer knew and omitted, and next assess whether the affidavit would still establish probable cause. *Miller*, 475 F.3d at 628. "If the 'corrected' warrant affidavit [still] establishes probable cause, then no civil liability lies against the officer." *Id.*; *see also Evans*, 703 F.3d at 651; *Osborne v. Georgiades*, 679 F. App'x 234, 239, 249–50 (4th Cir. 2017).

Taking all inferences in the Palmas' favor, the Court cannot conclude the omissions were material to the finding of probable cause to search the entire residence, as opposed to just the basement. The affidavit accurately supplied ample probable cause that Zelaya was trafficking in drugs and guns. He had sold drugs to the CI; had been driving around with drugs and guns in his

car; and had posted on social media while inside some residence with an AR-15.  J.A. 84, J.A. 87.  Further, Officer Farmer articulated sufficient evidence that Zelaya lived at the target residence.  Zelaya's two cars had been parked overnight in the driveway on many occasions, and he had been seen entering the home through a side door, and on at least one occasion, was seen in the backyard.  J.A. 88–89.  Last, as to the type of home, Officer Farmer included everything he knew: that it was a single family, brick structure with one front door, one mailbox, and one street number.  J.A. 78.

Against this factual backdrop, failing to tell the reviewing judge that Zelaya's method of entry to the house was limited only to the side door where other occupants used the front door does not *negate* probable cause to believe the entire residence contains evidence of a crime. Common sense dictates that even if Zelaya did not use the front door, he had sufficient access to the single-family home such that he could have secreted the items to be seized – drugs and guns – anywhere within it.  "[T]the factual and practical considerations of everyday life" support as much.  *Brinegar v. United States*, 338 U.S. 160, 175 (1949).  People often enter and leave from different doors of a house for myriad reasons having nothing to do with a lack of access to the entirety of the residence.  Indeed, it is an equally plausible inference that an individual uses a side or back door because the door is closest to his car, or because he wants to avoid tracking mud on the nice upstairs carpet, as it is because the person has been given access only to the basement.

Nor is Officer Farmer's omission regarding the Palmas' use of the front door material to the scope of the search.  Again, the "practical considerations" of personal preferences and natural predilections make alternative explanations for why persons use different entrances equally plausible.  This is so even if the other persons were indeed *wholly innocent* of any criminal

wrongdoing. It is a too-often unfortunate reality that innocent people live with others who are committing crimes and hiding the evidence right under the innocents' noses. Thus, on this record, the Court cannot conclude that the additional information of having seen the Palmas use the front door would have *negated* probable cause to believe that the entire residence contained evidence of firearms or controlled substance offenses.

In an effort to convince the Court otherwise, the Palmas weave into their argument a tapestry of facts that Officer Farmer learned *after* the execution of the warrant. More particularly, as to the next prong of *Franks*, whether the officer omitted evidence with reckless disregard, the Palmas argue that Officer Farmer "intentionally chose to withhold" evidence that "the Palmas lived in the upstairs of their house and that Zelaya did not;" that the Palmas were not involved in any criminal activity; and that the Palmas were not "hiding drugs or guns" for Zelaya. ECF No. 138-2 at 39–40. But viewing the record most favorably to the Palmas, no evidence supports that Officer Farmer knew any such facts at the time he swore out the affidavit.

First and most fundamentally, no evidence demonstrates Officer Farmer knew anything about the basement apartment. J.A. 50–51. He did not know who lived where, or anything about how the basement was being used. J.A. 20. Second, Officer Farmer knew nothing about the Palmas' relationship with Zelaya. Officer Farmer did not know whether they were confederates, family, neither or both. J.A. 74–75. Third, Officer Farmer did not know – one way or the other – whether the Palmas were complicit in Zelaya's criminal activity. J.A. 23. At best, the record reflects that Officer Farmer surmised that the record owners, the Palmas, lived in the home because he saw them use the front door. J.A. 31, J.A. 78, J.A. 89. Thus, because Officer Farmer cannot be held responsible for omitting facts that he *did not know* at the time he swore out the warrant affidavit, the Palmas' arguments come up short.

22

On this point, the Palmas' reliance on *United States v. Wharton*, Crim. No., ELH-13-0043, 2014 WL 3943358 (D. Md. Aug. 12, 2014), *aff'd*, 840 F.3d 163 (4th Cir. 2016), and *Hemingway v. Russo*, No. 2:16-CV-00313, 2018 WL 4082201 (D. Utah Aug. 27, 2018), does little to advance their position. *Wharton,* a criminal matter, concerned whether the case agent on a federal fraud investigation knowingly omitted facts which demonstrated that the targets of the investigation lived in separate areas of the same home. *Wharton*, 2014 WL 3943358, at *2. But unlike here, the affiant in *Wharton* had learned from many sources prior to drafting the warrant affidavit that the wife slept in an upstairs bedroom and the husband slept in the basement. *Id.* The affiant also knew that many family members had previously testified under oath about the couple's very separate living arrangement. *Id.* at *8. Despite such specific knowledge of these material facts at the time the affiant applied for the warrant, he told the judge none of them. *Id.* at *2.

At a subsequent *Franks* hearing, the affiant had no credible explanation for why he *knowingly* omitted those facts which confined the husband's private quarters to the basement. *Id.* at *13–14. Judge Hollander rightfully concluded that had the reviewing court knew all the information in the affiant's possession that was "germane to the subject" of the couple's living arrangements, the judge would not have authorized a search of the home that included the wife's bedroom. *Id.* at *18. Thus, critical to Judge Hollander's finding was that the agent specifically knew that the couple slept in separate quarters and chose to omit such information with a reckless disregard for whether such omissions would induce the magistrate judge to issue an overbroad warrant.

*Hemingway* is equally unhelpful to the Palmas for similar reasons. There, the search warrant affiant was investigating a suspected methamphetamine distributor, Misty Italasano.  No.

*Hemingway*, 2018 WL 4082201, at *2 (D. Utah Aug. 27, 2018).  During the investigation, a CI told the affiant that Italasano was living in a separate basement apartment while "selling methamphetamine" out of the home.  *Id.*  The affiant had also set up controlled purchases from Italasano, one of which occurred in the basement apartment and the other on the street after Italasano emerged.  *Id.*  The affiant also observed significant "short-stay traffic" coming in and out of the basement indicative of drug sales.  *Id.* at *2–3.  The affiant further knew that the homeowner, Hemingway, lived in the upstairs portion of the home and rented the basement to Italasano and others.  The affiant, however, had omitted all of this information from the warrant affidavit.  *Id.* at *3.

In denying summary judgment in favor of the officer on the constitutional claims, the Court underscored what the officer actually *knew* but left out of the warrant.  *Hemingway*, 2018 WL 4082201, at *7–8 (D. Utah Aug. 27, 2018).  Thus, the Court concluded that such omissions certainly were material as to the scope of the warrant and that the affiant exhibited, at a minimum, reckless disregard.  *Id.* at *8.  Again, contrary to Officer Farmer, the affiant in *Hemingway* omitted robust evidence that the suspected dealer lived in, and dealt drugs from, the basement.  *Id.*

Officer Farmer, by contrast, knew comparatively little beyond what justified a search of the entire residence.  Officer Farmer knew Zelaya was dealing drugs and running guns.  J.A. 28.  Officer Farmer knew that Zelaya had access to, and stayed at, the relatively modest brick home contemporaneous to his drug dealing and firearm possession.  J.A. 29.  But whether Zelaya had access to the whole of a relatively small house, or just some smaller portion, Officer Farmer had zero knowledge.  J.A. 20.  Nor can the Court credit that simply seeing a person use one door over

another leads to the plausible inference that the person's access to the home is confined only to the area connected to the point of entry.

In sum, when viewing the evidence most favorably to the Palmas, nothing supports their contention that Officer Farmer knowingly or recklessly omitted material facts about the living arrangements of the occupants such that his omissions produced an overbroad warrant. Alternatively, even considering the claimed omitted facts in context – that Zelaya had accessed the home through a side door and the Palmas through the front door – these facts were not material to the probable cause determination. Because of this, the "invalid warrant" claims must fail. Summary judgment is granted in favor of Defendants and denied as to the Palmas.

### B.    No-Knock Warrant

The Palmas separately contend that Officer Farmer's factual omissions led to an overbroad *no-knock* warrant for the entire home, not just the basement. ECF No. 138-2 at 47. Essentially, the Palmas argue that because of Officer Farmer's reckless omissions, the judge had issued a no-knock warrant for the entire home when probable cause existed only to authorize entry to the basement. *See id.* On this narrow theory, the challenge to the no-knock aspect of the warrant fails for the same reasons already discussed.

The Palmas also bring a larger "pattern and practice" claim in connection with the no-knock aspect of the warrant. *See infra* Part III.C. at pp. 27–28. It seems most prudent, therefore, to discuss the applicable constitutional principles surrounding the no-knock challenge and why the warrant affidavit provided the reviewing judge sufficient grounds to permit a no-knock entry.

Generally, the Fourth Amendment requires officers to "knock on the door and announce their identity and purpose before attempting forcible entry." *United States v. Singleton*, 441 F.3d 290, 293 (4th Cir. 2006) (quoting *Richards v. Wisconsin*, 520 U.S. 385, 387 (2006)); *see also*

*Wilson v. Arkansas*, 514 U.S. 927, 931-32 (1995); *Bellotte v. Edwards*, 629 F.3d 415, 420 (4th Cir. 2011) (citing *United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir. 1994)). However, upon a showing of "exigent circumstances," or reasons to suspect that announcing police presence may endanger officers or occupants or lead to the destruction of evidence, the reviewing judge may excuse the knock and announce requirement. *See United States v. Wardrick*, 350 F.3d 446, 452 (4th Cir. 2003); *United States v. Grogins*, 163 F.3d 795, 799 (4th Cir. 1998). In such cases, individual privacy interests animating the knock-and-announce rule must cede to public safety. *Wardrick*, 350 F.3d at 452 (citing *United States v. Ramirez,* 523 U.S. 65 (1998) (no-knock warrant permissible in light of suspect's history of violence and access to weapons)).

Here, the warrant affidavit provided, in painstaking detail, ample information supporting dispensation of the knock and announce rule. The affidavit chronicled Zelaya's contemporaneous possession of assault-style weapons and handguns and described his recent arrest for a "home invasion robbery in which [Zelaya] and 1-2 other suspects forced entry into an occupied residence at gunpoint." J.A. 84–86, J.A. 91. Officer Farmer also leaves no doubt for the reviewing judge about the reason for seeking a no-knock warrant. The affidavit concludes with:

> Your Affiant is requesting an exception to the knock and announce rule based upon the belief that the firearm(s) are located in the residence. As stated above, Zelaya is known to carry firearms and has a history of assault, robbery, and burglary. Your Affiant feels that knocking and announcing police presence would place those officers in serious danger. Therefore, your Affiant requests that entry be made without knocking and announcing police presence.

J.A. 92.

Based on the affidavit, the judicial officer's decision to permit a no-knock entry is beyond challenge.  Thus, any claimed constitutional violation arising from the manner of entry fails as a matter of law, and summary judgment must be granted on this liability theory as well.

In sum, when viewing the record most favorably to the Palmas, they have failed to adduce sufficient evidence that Officer Farmer recklessly omitted material facts from the search warrant.  Accordingly, all claims against the individual Defendants premised on the purportedly "invalid warrant," fail as a matter of law.  Summary judgment is thus granted in Defendants' favor on Counts I, II, VI and IX.

### C.        Pattern and Practice (Counts III & V)

The Court turns next to the Palmas' "pattern and practice" claims in Counts III and V.  In each, the Palmas challenge the no-knock manner of entry as part of a larger unconstitutional policy and practice of encouraging unnecessary and indiscriminate no-knock search warrants. ECF No. 123 ¶¶ 127–40, 152–62.  The Palmas argue that they are entitled to summary judgment because they have demonstrated "an undeniable pattern of overusing no-knock search warrants in Montgomery County," so much so that the no-knock entry has displaced knock-and-announce as the "default."  ECF No. 138-2 at 53–54.  The County responds that the facts indisputably reflect that it had in place sufficient safeguards such that no unconstitutional pattern and practice claim can survive summary judgment.  ECF No. 133-1 at 43.

In the Court's view, the claim fails for a more fundamental reason.  Because the Palmas' individual warrant claims fail as a matter of law, they cannot pursue the pattern and practice claim.  No doubt, a municipality may be held responsible for the constitutional violations committed by its officers, *if* the plaintiff can show that the violations flowed from an unconstitutional policy, practice, habit, or custom.  *Monell v. Dep't of Social Servs. of City of*

27

*N.Y.*, 436 U.S. 658, 690 (1978); *see also Prince George's Cnty. v. Longtin*, 419 Md. 450, 492 (2011); *Krell v. Queen Anne's Cnty., No. JKB-18-637, 2018 WL 6523883, at *15 (D. Md. Dec. 12, 2018)*.  But the plaintiff must adduce some evidence that his own rights had been violated, and that those violations arose out of municipality's unconstitutional policy or custom.  *Bost v. Wexford Health Sources, Inc.*, No. ELH-15-3278, 2022 WL 4290528, at *28 (D. Md. Sept. 16, 2022) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)); *see also Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).  The "'direct causal link'" between the policy or custom and the deprivation of rights" remains essential to the claim. *Sparrow v. City of Annapolis*, No. WMN-16-1394, 2017 WL 3413596, at *10 (D. Md. Aug. 9, 2017) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 386 (1989)).  Thus, where no individual underlying constitutional violation can proceed, the *Monell* claim too must fail. *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001)).[4]

Because the Court has granted summary judgment on the Palmas' individual challenge to the validity of the no-knock warrant, the Palmas cannot pursue the pattern and practice claim. The Palmas have suffered no constitutional injury purportedly caused by the unlawful pattern and practice.  For this reason alone, the Court grants summary judgment in the Defendants' favor on these Counts.

---

[4] This is precisely why many courts in this district bifurcate discovery on individual and *Monell* claims so that resources are not expended unnecessarily investigating the pattern and practice allegations where the plaintiff cannot sustain an individual cause of action premised on the same constitutional violations.  *See, e.g.*, *Washington v. Baltimore Police Dep't*, No. CV SAG-19-2473, 2020 WL 6277276, *1–2 (D. Md. Oct. 26, 2020); *Peprah v. Williams*, No. CV GLR-18-990, 2019 WL 224245, at *10 (D. Md. Jan. 15, 2019); *Burgess v. Baltimore Police Dep't*, No. CV RDB-15-0834, 2016 WL 1159200, at *2 (D. Md. Mar. 23, 2016); *James v. Frederick Cnty. Pub. Sch.*, 441 F. Supp. 2d 755, 762 (D. Md. 2006).

###### D.    Excessive Force (Counts IV & VII)

Counts IV and VII allege that Officers Murray, Dove, and MacGregor violated Mr.

Palma's right to be free from excessive force pursuant to the Fourth and Fourteenth Amendments

and Articles 24 and 26 of the Maryland Declaration of Rights.  ECF No. 123 ¶¶ 141–51, 175–

85.[5]  Count VIII asserts a common law battery claim against the same individual officers

predicated on the same events.  *Id.* ¶¶ 186–89.  No party seeks summary judgment on the

excessive force or battery claims as to Officers Dove and MacGregor, so those claims will

proceed to trial.  ECF No. 133-1 at 11; ECF No. 138-2 at 34.

Officer Murray contends, however, that summary judgment is proper in his favor as to all

force-related claims because no rational trier of fact could conclude he used an unreasonable

degree of force in response to Mr. Palma's resistance during the raid.  ECF No. 133-1 at 38.

Alternatively, Officer Murray contends that even if a rational juror could conclude that he used

excessive force against Mr. Palma, Officer Murray is entitled to qualified immunity.  *Id.* at 38–

40.  The Court considers each argument in turn.

It is bedrock that "[t]he Fourth Amendment prohibition on unreasonable seizures bars

police officers from using excessive force to seize a free citizen."  *E.W. by and through T.W. v.*

*Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018) (quoting *Jones v. Buchanan*, 325 F.3d 520, 527 (4th

Cir. 2003).  *See also Graham v. Connor*, 490 U.S. 386, 395 (1989).  Put plainly, an officer may

use only that force which is necessary to bring a citizen under lawful control.  *See Graham*, 490

U.S. 396-97.  An excessive force claim asks whether a reasonable officer in the defendant's

---

[5] Count IV, the Fourth and Fourteenth Amendments claim, is against the individual Officers Murray, Dove, and MacGregor, ECF No. 123 at 21, whereas Count VII adds the County in its supervisory capacity pursuant to the LGTCA.  *Id.* at 27.  Accordingly, liability as to the County on the state constitutional claims rise and fall with liability as to the individual defendant officers.  *See Longtin,* 419 Md. at 492.

shoes would have known that the force he used had been excessive given the particular circumstances at hand, and without regard to the officer's "'underlying intent or motivation.'" *E.W. by and through T.W.*, 884 F.3d at 179 (quoting *Graham*, 490 U.S. at 397); *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc); *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996). The inquiry focuses on "the moment that the force is employed," *Henry*, 652 F.3d at 531, to ascertain whether the totality of the circumstances supports that the use of force against the citizen as reasonable. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *see also Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015).

The record, viewed most favorably to Mr. Palma, does not justify summary judgment. First, it is undisputed that three officers – Murray, MacGregor, and Dove – confronted Mr. Palma in the bedroom. J.A. 191, J.A. 219, J.A. 247. Of the four men, each tell a markedly different story about what happened, making the claim particularly unsuitable for resolution at the summary judgment stage. *Morrison v. Nissan Co.*, 601 F.2d 139, 141 (4th Cir. 1979).

If Officer Murray is believed, then he clearly did not use excessive force on Mr. Palma. Officer Murray describes a scene in which Mr. Palma not only grabbed his gun, but fought Officer Murray such that Officer Murray became pinned under Mr. Palma; and other than pushing Mr. Palma onto the bed in response to having his gun grabbed, Officer Murray swears that he played no role in "actually restraining" Mr. Palma. J.A. 190.

Mr. Palma, by contrast, describes how each of three officers assaulted him even after he was physically restrained. Mr. Palma attests that Officer MacGregor punched him in the face as the two other officers held his arms. J.A. 120. The officers then flipped Mr. Palma over with such force that his face hit and broke the drywall. *Id.* Mr. Palma further describes that when he was pinned to the bed, painfully and in a manner where he could not move, another officer

punched him in the ribs.  J.A. 121.  Given that Officer Murray had been party to restraining Mr.

Palma, his role in this melee can only be sorted out at trial.  J.A. 222–223 (Officer Dove

describing that, "[i]t was myself, Officer Murray, and Officer MacGregor got ahold of Mr.

Palma, and we placed him on the bed.")

Officer Murray next argues that he is entitled to qualified immunity on Count IV, the

excessive force claim brought pursuant to 42 U.S.C. § 1983, because it was not "clearly

established that it was unreasonable for an officer to push a person during a service of a search

warrant in response to that person grabbing the officer's weapon."  ECF No. 133-1 at 41.[6]

Government officials sued in their individual capacities are entitled to the defense of qualified

immunity where "their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982); *accord Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).  The doctrine of

qualified immunity "balances two important interests— the need to hold public officials

accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Pearson v.*

*Callahan*, 555 U.S. 223, 231 (2009).

The qualified immunity inquiry is two-fold.  Courts must consider (1) whether the facts

established by the plaintiff "make out a violation of a constitutional right;" and if so (2) "whether

the right at issue was 'clearly established' at the time of defendant's alleged misconduct."

*Pearson* 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 194 (2001)).  The Court must

---

[6] The Palmas correctly note that no qualified immunity defense exists as to their state constitutional excessive force claim.  ECF No. 138-2 at 64 n. 210.  *See Sneed v. Bankhead*, No. 8:20-cv-00412-PX, 2022 WL 125277, at *6 n.7 (D. Md. Jan. 13, 2022) (citing *Meyers v. Baltimore Cnty.*, 981 F. Supp. 2d 422, 430 (D. Md. 2013)).

undertake this inquiry viewing the facts "in the light most favorable to the party asserting the injury." *Mansoor v. Trank*, 319 F.3d 133, 137 (4th Cir. 2003) (citation and internal quotation marks omitted). Although the Court may consider these twin prongs in the order which best suits "the circumstances in the particular case at hand," *Pearson*, 555 U.S. at 236, it is preferable to consider first whether the officer's conduct violated the plaintiff's particular constitutional right because such a determination advances the discourse as to whether the right is clearly established. *Saucier*, 533 U.S. at 201; *Pearson*, 555 U.S. at 236.

As to whether any constitutional right is clearly established, the Court must assess if the contours of the right "are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In this regard, the "clearly established" analysis must focus on the law in place at the time of the alleged misconduct. *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotations and citation omitted); *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). *See also White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam). Although qualified immunity should be decided at the earliest possible phase of litigation, disputed issues of fact may preclude such a determination until trial. *E.g.*, *Burno-Whalen v. Maryland*, No. GJH-15-564, 2016 WL 1259556, at *5 (D. Md. Mar. 28, 2016). *See also Hicks v. Ferreyra*, 965 F.3d 302, 308 (4th Cir. 2020); *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 180 (4th Cir. 1998) (quoting *Buonocore v. Harris*, 65 F.3d 3347, 359 (4th Cir. 1995) ("'[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants.'").

Officer Murray's plea for qualified immunity focuses exclusively on his initial encounter with Mr. Palma, and on when Mr. Palma momentarily grabbed Officer Murray's rifle. ECF No.

133-1 at 41–42.  But the heart of Mr. Palma's excessive force claim lies in what happened after

Mr. Palma had been restrained, when the officers punched him and slammed his head into the

wall.  J.A. 120–121.  It has long been "clearly established that a police officer [is] not entitled to

use unnecessary, gratuitous, and disproportionate force" against an individual who no longer

poses a threat to officer safety.  *Jones v. Buchanan*, 325 F.3d 520, 534 (4th Cir. 2003).  Applied

here, one officer cannot purposely restrain Mr. Palma while a fellow officer punches him in the

face.  Nor can that same officer assist in ramming Mr. Palma's face into a wall.  *See, e.g.*,

*Thomas v. Holly*, 533 Fed. Appx. 208, 221 (4th Cir. 2013) (clearly established constitutional

violation when officer punched restrained suspect in face with such force as to break his jaw).

Thus, if Mr. Palma is believed at trial, Officer Murray's conduct would be clearly

unconstitutional to any reasonably well-trained officer at the time.  Because genuine fact issues

preclude summary judgment on whether Officer Murray used excessive force on Mr. Palma, the

Court cannot conclude as a matter of law that Officer Murray enjoys qualified immunity.  Officer

Murray's motion for summary judgment is denied as to Counts IV & VII.

### E.    Battery (Count VIII)

Last, as to the battery claim against Officer Murray (Count VIII), this claim, too, survives

challenge for the same reason.  ECF No. 133-1 at 41-42.  Generally, a battery amounts to

intentional "harmful or offensive" non-consensual contact.  *Johnson v. Prince George's Cnty.,*

*Md.*, No. DKC 10-0582, 2011 WL 806448, at *6 (D. Md. Mar. 1, 2011) (quoting *Nelson v.*

*Carroll*, 355 Md. 593, 601 (1999)).  In the law enforcement context, an officer is liable for

battery where no legal authority or justification exists to support the officer's unwelcome

physical contact with the plaintiff.  *Id.* at *7.  *See Williams v. Prince George's Cnty.*, 112 Md.

App. 526, 554 (1996) (citing *Ashton v. Brown*, 339 Md. 70, 119 (1995)); *see also Stutzman v.*

*Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (quoting *French v. Hines*, 182 Md. App. 201, 266 (2008) (explaining that an officer who "'uses excessive force, or force greater than is reasonably necessary under the circumstances . . . may be liable' for battery").

The battery claim is one and the same with the excessive force allegation.  *Compare* ECF No. 123 ¶¶ 186-89, *with* ECF No. 123 ¶¶ 144 & 178.  Therefore, just as genuine issues of material fact preclude summary judgment on the excessive force claim, so too do they preclude summary judgment for battery.  *See Young v. Prince George's Cnty., Md.*, 355 F.3d 751, 759 (4th Cir. 2004) ("Given that summary judgment should not have been granted on Young's excessive force claim, we also hold that the district court's grant of summary judgment on Young's state law battery claim was erroneous."), *abrogated on other grounds by Wilkins v. Gaddy*, 599 U.S. 34 (2010).  Summary judgment in Officer Murray's favor is denied.

**V.    Conclusion**

For the foregoing reasons, the Palmas' cross-motion for partial summary judgment is denied.  Defendants' motion for partial summary judgment is granted in part and denied in part. A separate Order follows.


September 28, 2023                                              /s/
Date                                                                   Paula Xinis
                                                                        United States District Judge